868 So.2d 830 (2004)
Dr. Dion Lynn ARMSTRONG
v.
LOUISIANA STATE BOARD OF MEDICAL EXAMINERS.
No. 2003-CA-1241.
Court of Appeal of Louisiana, Fourth Circuit.
February 18, 2004.
*831 Michael C. Darnell, Edwin R. Murray, Murray, Darnell & Associates, L.L.C., New Orleans, LA, for Plaintiff/Appellant.
C. Byron Berry, Jr., Adams and Reese LLP, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, SR., Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
This is an appeal from a judgment of the trial court affirming a decision of the Louisiana State Board of Medical Examiners (the "Board") that imposed disciplinary action on Dr. Dion Lynn Armstrong for violating La. R.S. 37:1285(A)(30), which provides that the Board may suspend, revoke, or impose restrictions on any license for violation of any of its rules. The Board's rules that are at issue are entitled "Medications Used in the Treatment of Noncancer-Related Chronic or Intractable Pain," 45 La. Adm.Code (LAC) §§ 6915-6923 (the "Pain Rules").

FACTUAL AND PROCEDURAL BACKGROUND
Dr. Armstrong is a sole practitioner practicing medicine in the New Orleans area. He was initially licensed to practice in this state in 1993. He considers himself a pain management specialist. Although he initially practiced as a general practitioner, he began concentrating his practice in the area of pain management in 1997. As noted above, the Board adopted the Pain Rules in that same year.
Between 1997 and 2001, except for his six-month suspension period (April to October 1999), Dr. Armstrong prescribed various controlled substances and other medications to the eleven patients under consideration in this case on a longbasis as treatment for their non-cancer-related chronic or intractable pain. In May 2002, the Board charged Dr. Armstrong by an administrative complaint with violating several of the documentary requirements of the Pain Rules in his treatment of those patients.[1] The complaint *832 alleged that he committed essentially the same violations for each of the eleven patients under consideration;[2] to wit:
 Failure to perform or record in the patient's chart a thorough evaluation of the patient prior to or at any time during the treatment. Section 6921(A)(1).[3]
 Failure to establish or fully document in the patient's chart an individualized treatment plan prior to or at any time during the treatment. Section 6921(A)(3).[4]
 Failure to see or document in the patient's chart that Dr. Armstrong saw the patient at appropriate regular and frequent intervals in order to assess the efficacy of treatment, assure that controlled substance therapy remains indicated, and evaluate the patient's progress toward treatment objectives and any adverse drug effects. Section 6921(B)(1).[5]

*833  Failure to take primary responsibility for or document in the patient's chart that he was taking the primary responsibility for the controlled substance therapy employed by him. Section 6921(B)(3).[6]
 Failure to document in the patient's chart the medical necessity for the use of more than one type or schedule of controlled substance. Section 6921(B)(5).[7]
 Failure to document and maintain in the patient's chart accurate and complete records of history, physical and other examinations and evaluations, consultations, laboratory and diagnostic reports, treatment plans and objectives, controlled substance and other medication therapy, informed consents, periodic assessments, and/or review and the results of all other attempts at analgesia which he has employed alternative to controlled substance therapy. Section 6921(B)(6).[8]
 Failure to document in the patient's medical record the date, quantity, dosage, route, frequency of administration, the number of controlled substance refills authorized, as well as the frequency of visits to obtain refills. Section 6921(B)(7).[9]
In October 2002, an administrative hearing was held at which the Board introduced the following documentary evidence: 1) the Board's records regarding Dr. Armstrong's prior appearances before it and two prior disciplinary infractions; 2) the administrative complaint under consideration; 3) the Board's records regarding certain procedural matters in this case; 4) the subpoenas duces tecum the Board issued to Dr. Armstrong; 5) the subpoenas *834 duces tecum the Board issued to various pharmacies and the returns thereto; 6) a pharmacy survey;[10] 7) the 2002 Physician Desk Reference and Mosby's GenRx entries for the various controlled substances and other medications Dr. Armstrong prescribed to the patients under consideration; 8) the state and federal controlled substance schedules for the pertinent time period; and 9) two medical journal articles.
The copies of the patients' charts that the Board introduced were obtained by subpoena from Dr. Armstrong. Before the hearing, the Board compiled an exhibit book, which included the copies of those charts. Dr. Armstrong and his attorney were allowed to review the exhibit book before the hearing, yet no objection was made. Although Dr. Armstrong in his testimony claimed the copies of his patients' charges were incomplete in that they did not include a copy of the "Pain Management Agreement" he claimed was in the original charts, he neither introduced copies of his original charts nor any other documentary evidence.
The sole witness at the hearing was Dr. Armstrong.[11] In an attempt to streamline the hearing, the parties stipulated that Dr. Armstrong's testimony as to the two charts that were covered in detailL.C.'s and M.G.'swould be consistent and his responses would be the same for the other nine patients under consideration.[12] More particularly, the parties agreed that Dr. Armstrong's testimony as to what matters the Pain Rules required be documented in writing would be the same for all the patients.
In December 2002, the Board rendered its decision finding Dr. Armstrong violated several of the provisions of the Pain Rules. Given the stipulation noted above, the Board's ruling focused on its review of the deficiencies in L.C.'s chart; summarized, the Board's ruling was as follows:
 Dr. Armstrong first saw L.C. on February 11, 1998. At that time, L.C.'s chief complaints were neck and back pain. The three-page patient history form L.C. filled out indicated that he had neck surgery, which the surgical report in the record reflects took place on March 16, 1990. L.C. also reported being in a motor vehicle accident in 1997, yet there is no mention in the chart of any injury resulting from that accident. Nor does the chart contain any medical records from the Hancock Medical Center, where L.C. apparently went after the 1997 accident for treatment. However, a "Pain Assessment Form," which is in the chart, shows that he claims to be suffering from pain in the neck, back, and down his legs as a result of that accident. The chart contains no reports of injury or treatment following the 1997 accident.
 Another Pain Assessment Form in the chart shows that he has suffered from neck and low back pain, pain down his left arm, and leg cramps in his calves, since the neck surgery in 1990. The chart contains various diagnostic reports and an operative report from the 1990 surgery.
 Although the chart contains a physical examination form for each visit, Dr.

*835 Armstrong failed to record the patient's vital signs at any time during the course of treatment. Also, following each visit, Dr. Armstrong wrote out his diagnosis and listed the substances he prescribed. However, the chart contains no detailed treatment plan.
 As to the requirement that the medical necessity of using more than one type of controlled substance, the chart does not document the reason why the various substances are being prescribed. At the hearing, Dr. Armstrong explained that virtually all of his patients suffer from nausea because of the pain drugs they are taking and that they all have trouble sleeping. He stated that these conditions are so universal that it is unnecessary to note them in the chart; he says this is a given in his practice.
 The chart failed to document that the patient was informed of the risks and benefits of controlled substance therapy, nor does it contain an informed consent by the patient to the treatment offered him, which the Pain Rules specifically require. Dr. Armstrong explained at the hearing that he began using an informed consent in 2001 and that every patient had signed one. He testified he could not understand why these were not in the charts. He also testified that he fully explained the risks and benefits of controlled substance therapy to the patient at the initial visit.
 When questioned about the charge of failure to document that he assumed primary responsibility for the treatment of the patient, Dr. Armstrong responded that he asked the patient if he was seeing other physicians and instructed them that he wanted to be their only physician. He also testified that he thought it was the patient who was primarily responsible for taking the drugs in the manner in which he prescribed them. The chart, however, does not document these facts.
 Dr. Armstrong was suspended from April 14, 1999 until October 1, 1999. During that time he did not treat L.C. When he resumed practice, he resumed treating L.C., yet he did not inquire as to the treatment L.C. received during the suspension period. Neither did he seek any information from any physician who might have treated L.C. during that suspension period.
 The chart fails to note the number of refills given with each prescription. At the hearing, Dr. Armstrong testified that he did not note the number of refills because he could tell this based on the frequency of the patient's visits. He explained that his method of prescribing was based on a three-week cycle. If a patient did not return for six weeks, it meant he had received one refill. For nine weeks, he received two refills. And for twelve weeks, he received three refills.
Rejecting Dr. Armstrong's contention that some of the requirements of the Pain Rules need not be documented, the Board stressed that various provisions of the Pain Rules require documentation and reasoned that "[n]ot only the Pain Rules, but the requirements of good medicine, require that a chart be maintained in such a way that another physician, reading the chart, will be fully informed as to all matters related to the diagnosis and treatment of the patient." Continuing, the Board commented:
The Pain Rules are not a guide to what one can get away with. They are intended as a guide to good medicine in this delicate area, and as a protection to *836 the public from less than scrupulous practitioners. Other, less drastic modalities should be tried, or at least seriously considered, before controlled substances are resorted to. Treatment plans should not be merely a list of drugs, but a reasoned approach to the problems, with ultimate goals fully explained. If there is no improvement shown in a reasonable period of time, physicians in other specialties should be consulted in an attempt to alleviate the suffering of the patient. Failure to make a good faith effort to practice good medicine, and to follow the Pain Rules completely and thoroughly opens the practice of medicine to comparison with illegal drug dealers.
Given the evidence presented, the Board concluded that Dr. Armstrong was clearly guilty of failing to maintain full documentation of the evaluation and treatment of the eleven patients under consideration.
Turning to the issue of sanctions, the Board began by summarizing Dr. Armstrong's two prior disciplinary infractions, stating:
In December, 1990, he applied to the Board for full licensure, which was denied because of certain criminal charges and convictions which had not been revealed when he first applied for intern registration. After a hearing on the denial, because of certain mitigating circumstances, the Board permitted Dr. Armstrong to withdraw his application for licensure, and gave him the opportunity to complete an internship.
In 1998, Dr. Armstrong was once again before the Board for making untrue statements on his applications for renewal of his license in both 1996 and 1997. He was found guilty of that charge, and his license was suspended for a period of six months. It was reinstated on October 1, 1999.
Given these prior disciplinary infractions, the Board reasoned that it had given Dr. Armstrong several opportunities to practice medicine in this state despite his "serious academic and ethical shortcomings." The Board further reasoned that Dr. Armstrong's actions in this case could not be deemed to be the result of carelessness or ignorance on his part; instead, the Board found Dr. Armstrong's actions "demonstrated a disregard of the clear requirements of the Pain Rules, and of the principles of good medicine." Given those findings, the Board imposed the following sanctions: (1) his license to practice medicine in this state was suspended for two years; (2) his privilege of prescribing, administering, or dispensing any state or federally designated controlled substances or the drugs Stadol, Nubane, or Dalgan or any generic thereof was suspended for five years; (3) he was required to attend at least fifty hours of Continuing Medical Education each year his license was suspended; (4) he was fined $3,000 and ordered to pay all costs of the proceeding; and (5) he was required to personally appear before the Board ninety days before the completion of the suspension to apply for reinstatement of his license.
Dr. Armstrong then filed a Petition for Judicial Review to the Civil District Court and requested a stay of the Board's ruling, which the district court, over the Board's objection, granted. In April 2003, the district court affirmed the Board's decision. Finding that the required documentation was not made, the trial court stated in its reasons for judgment:
These rules are very specific and require a treating physician to clearly document in the patient's medical record the entire treatment plan of the patient. The Board reviewed Dr. Armstrong's medical charts, including the pharmacy entries for controlled substances or *837 medications he prescribed, of certain identified patients to determine if the pain rules were complied with. This evidence revealed that Dr. Armstrong improperly evaluated several patients as there was no record of vital signs or reports of injury or treatment. He also failed to document why various substances were prescribed on certain occasions and failed to note the number of refills given with each prescription. The record further showed that there was no documentation of informed consent by the patient to the treatment offered and that the appellant failed to document the medical necessity of the use of more than one type of controlled substance. These deficiencies were evident in all of the medical records reviewed.
The trial court also rejected Dr. Armstrong's argument that the sanction was excessive. This appeal followed.

ASSIGNMENT OF ERROR
On appeal, Dr. Armstrong asserts the following assignment of error:
The Board erred in finding that Dr. Dion Lynn Armstrong violated R.S. 37:1285A(30) which is founded upon violation of the Board's rules relative to Medications Used in the Treatment of Non-Cancer Related Chronic or Intractable Pain, 45 LA. Adm.Code Section 6915-6923 also known as the Board's Pain Management Rules.
Therefore, in making the decision to suspend Dr. Armstrong's license for a period of two years; suspension of his right to order, prescribe, administer, or dispense any state or federally designated controlled substance or the drug Stadol, Nubande, or Dalgan or any generic thereof for a period of five years; requiring him to obtain not less than 50 hours of Continuing Medical education per year while his license is suspended; and paying a fine of $3,000 plus all costs of this proceeding, the Board's actions were arbitrary, capricious, characterized by abuse of discretion, and clearly an unwarranted exercise of their discretion. The actions herein taken by the Board can clearly be classified as excessive and unreasonable. The Board did not provide a sufficient enough record to establish a standard of care and show the alleged breach of that standard or to enable a reviewing court to determine if their decision was justified.

STANDARD OF REVIEW
The jurisprudence has recognized that the standard of review of an administrative agency's decision is narrower than the traditional standard of review applied to civil and criminal appeals. Reaux v. Louisiana Bd. of Med. Examiners, XXXX-XXXX, p. 3 (La.App. 4 Cir. 5/21/03), 850 So.2d 723, 726, writ denied, 2003-2546 (La.11/26/03), 860 So.2d 1138. The exclusive grounds upon which an administrative agency's decision may be reversed or modified on appeal are enumerated in La. R.S. 49:964(G) of the Administrative Procedure Act ("APA"). Id. Defining the scope and standards for judicial review of agency decisions, Section 964(G) provides that a court can reverse an agency's decision if the appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

*838 (6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
La. R.S. 49:964 G. Moreover, the APA provides that "[t]he agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence." La. R.S. 49:956(4).
A reviewing court should not set aside an administrative agency's decision to impose a particular sanction unless that decision can be characterized as arbitrary, capricious or an abuse of discretion. Holladay v. Louisiana State Bd. of Med. Examiners, 96-1740, p. 18 (La.App. 4 Cir. 2/19/97), 689 So.2d 718, 727 (citing La. R.S. 49:956(5)). "The imposition of an administrative sanction is in the nature of a disciplinary measure. In deciding what, if any, discipline to impose, the Board may be strict, moderate or lenient." Holladay, 96-1740 at p. 18, 689 So.2d at 727.
The jurisprudence has also recognized that "in reviewing such [administrative] actions, courts must be cognizant of the strong presumption of validity and propriety in such administrative actions where casting judgment upon the professional behavior of a fellow member of a profession is a matter peculiarly within the expertise of an agency composed of members of that profession." Montalbano v. Louisiana State Bd. of Med. Examiners, 560 So.2d 1009, 1011 (La.App. 4 Cir.1990). Given the jurisprudential presumption of correctness of an agency's actions, the appellant, Dr. Armstrong, has the burden of proving the record contains no facts to establish the validity of the charges levied against him.

DISCUSSION
On appeal, Dr. Armstrong's principal argument is that the Board's failure to present expert testimony to establish the applicable standard of care and his violation of that standard precludes review by this court and impairs his due process rights. Dr. Armstrong further argues that the record contains only his testimony, the Board's ruling, and the trial court's decision affirming that ruling and that there is not a sufficient basis on which this court can conduct a judicial review of the record.
In support of his position, Dr. Armstrong relies on our reasoning in Matter of DiLeo, 95-0444 (La.App. 4 Cir. 9/28/95), 661 So.2d 162. Particularly, he cites our reasoning that the Board, in finding Dr. DiLeo guilty of over-prescribing pain medication, could not rely solely on the subjective interpretation of a single physician who failed to cite any regulation or statute that had been violated. By analogy, Dr. Armstrong argues that the Board improperly relied solely on its subjective interpretation of its Pain Rules to find that he failed to satisfy the documentation requirements.
The Board counters that DiLeo is distinguishable because it predates the Pain Rules and because Dr. DiLeo adequately documented his prescriptions and medical records. The Board further counters that the primary evidence supporting its decision is Dr. Armstrong's charts and his testimony. The Board still further counters that we should affirm the Board's decision because Dr. Armstrong has not demonstrated any grounds for supplanting *839 the Board's decision, either factually or legally. We agree.
Dr. Armstrong's reliance on DiLeo is misplaced. In DiLeo, the sole evidence supporting the Board's finding that Dr. DiLeo improperly prescribed pain medication to eight patients was an expert's testimony that the duration of the prescriptions was too lengthy. That expert, however, admitted there was no written standard as to the length of pain medication and that there were differing schools of thought on the issue. Reversing, we reasoned that the record lacked any evidence of the appropriate standard of care as to the duration for which chronic pain could be treated with narcotic pain medication. We noted that this was not a case in which the doctor was prescribing pain medication without an examination or without a reasonable belief that the patient was in pain or was in need of medication; rather, the record reflected that Dr. DiLeo conducted regular exams of these patients and kept adequate medical records of their treatment.
In Holladay, supra, we rejected an attempt to extend DiLeo and limited it to the unique factual and evidentiary setting presented in that case. In so doing, we noted that our holding in DiLeo was not a legal one but rather a factual one based on the insufficiency of the evidence of the standard of care. In DiLeo, we held that the standard of care could be established by regulation or by statute. In Holladay, supra, we clarified that the standard could be established by any appropriate evidence and that the Board was not limited to publishing written standards. We further stated in Holladay that DiLeo did not apply in "a case where the evidence in the Board's record clearly established the appropriate standards of care for the management and treatment of patients complaining of non-malignant pain with chronic medication therapy and the physician's violation of such standards." Holladay, 96-1740 at p. 10, 689 So.2d at 723. Such is the case here.
Here, the standard of care clearly is established by the documentary requirements enumerated in the Pain Rules. As the Board stresses, the Pain Rules, which were adopted pursuant to the APA, are self-proving and have the force of law. The Board's apparent purpose for adopting these Pain Rules was to alleviate the concerns of physicians over being disciplined for over-prescribing pain medication.
Commenting on the interplay between such pain rules and disciplinary investigations, one medical review board stated: "`the general policy that was made known to physicians is that we leave prescribing and pain management control issues to their professional judgment, but if there is a complaint, they better have proper documentation, such as informed consent, history and physical monitoring, etc.'" Diane E. Hoffman & Anita J. Tarzian, Achieving the Right Balance in Oversight of Physician Opioid Prescribing for Pain: The Role of State Medical Boards, 31 J.L. Med. & Ethics 21, 26 (2003).
The distinction, which the above comment makes, between matters of professional judgment regarding prescribing practices and requirements of maintaining proper documentation is insightful in resolving Dr. Armstrong's arguments. Matters of professional judgment, such as the physician's prescribing practices at issue in DiLeo, may be the subject of different schools of thought, which would be relevant in establishing the standard of care.[13] *840 In contrast, the documentary requirements of the Pain Rules are not subject to such disputes. See Halter v. State, Dep't of Commerce and Econ. Dev., Med. Bd., 990 P.2d 1035 (Alaska 1999)(rejecting argument of doctor charged with failure to properly record controlled substance prescriptions that an express standard of conduct was required regarding record keeping requirements).
To the extent Dr. Armstrong's argument is based on the notion that the documentary requirements of the Pain Rules are subject to varying interpretations, we find the reasoning in McFadden v. Mississippi State Bd. of Med. Licensure, 735 So.2d 145 (Miss.1999), instructive. There, the court noted that "Dr. McFadden characterizes this case as `a disagreement among two groups of professionals about the appropriate course of treatment' for chronic nonmalignant pain patients instead of a disciplinary action for improper patient monitoring and improper controlled substance prescribing practices." McFadden, 735 So.2d at 160. Citing Holladay, the McFadden court noted:
[T]he Louisiana court held that [the physician's] argument misses the point. It is not [the physician's] liberal prescribing philosophy which resulted in the Board's decision, rather it was [the physician's] failure to adhere to basic precepts of medical practice or to follow the appropriate medical standards that were his violations. Certain basic standards are recognized by both schools of thought." Id. Similarly, this court concludes that Dr. McFadden misses the point. It was Dr. McFadden's failure to record the issuance of numerous controlled substance prescriptions, among other things, in violation of the Board's rules and regulations that resulted in this disciplinary proceeding.
McFadden, 735 So.2d at 161.
Similarly, we conclude that Dr. Armstrong's argument regarding the differences of opinion as to the meaning of the documentary requirements of the Pain Rules misses the point. The charges at issue in this case regarding Dr. Armstrong's failure to maintain accurate records constitute violations not only of the Pain Rules, but also of prudent medical practice. As we noted in discussing the practice of prescribing controlled substances for the relief of non-malignant pain in Holladay, "when [such practice is] unaccompanied by appropriate testing, diagnosis, oversight and monitoring, as occurred in Dr. Holladay's case, the physician falls below generally accepted standards of care, constituting the practice of bad medicine." Holladay, 96-1740 at p. 17, 689 So.2d at 727.[14] In this case, the Board found Dr. Armstrong's conduct amounted to just that: a violation of not only the Pain Rules but also of "the requirements of good medicine."
Dr. Armstrong further argues, citing out of state jurisprudence,[15] that without expert testimony in the record as to the applicable standard of care and the violation of that standard, a reviewing court, which lacks scientific and technical expertise, *841 cannot effectively determine the basis for the board's decision and evaluate the sufficiency of the evidentiary support. Louisiana courts have never adopted that position. Rather, as a commentator points out, Louisiana courts have taken the position that evidence of the standard of care is required, but they have not voiced a preference for expert testimony. See Timothy P. McCormack, Comment, Expert Testimony and Professional Licensing Boards: What is Good, What is Necessary, and the Myth of the Majority-Minority Split, 53 Me. L.Rev. 139, 177-178, n. 272 (2001)(citing DiLeo, supra, and Holladay, supra) ("McCormack").
One of the key factors in determining the type of evidence required to establish the standard of care is the nature of the charge before the board. McCormack, supra. Although expert testimony may be required to prove charges involving professional judgment and clinical practice or complex and highly technical matters, common sense may be enough to make evaluations of other type of charges that are within the scope of a lay person's comprehension. McCormack, supra. As suggested above, charges of violating the documentary requirements of the Pain Rules fall into the latter category. This categorization is buttressed by the following reasoning in Arthurs v. Board of Registration in Med., 383 Mass. 299, 418 N.E.2d 1236, 1243-44, n. 22 (1981), another decision involving improper prescription practices:
The findings that prescriptions for controlled substances were not recorded, or were recorded on the wrong patient card, as well as the findings as to the quantity of drugs prescribed at short intervals to patients in excess of Arthurs's [sic] specific directions to take one tablet daily, all support the board's conclusion that Arthurs prescribed controlled substances for other than a legitimate medical purpose.
Our review of these findings does not require the use of specialized knowledge. It requires only an examination of the board's findings as to the dosage and frequency of Arthurs's [sic] prescriptions, the prescriptions Arthurs failed to record on his patient cards, and a review of the testimony concerning Arthurs's[sic] prescribing of controlled substances to [the patients] ... We view these as matters of common experience and common sense, not technical expertise.
Id.[16]
As in Arthurs, supra, we find the documentation requirements of the Pain Rules *842 that Dr. Armstrong is charged with violating are "matters of common experience and common sense, not technical expertise." Id. This point was illustrated at oral argument when the Board's attorney acknowledged that some of the Pain Rules involve discretionary decisions and could require expert testimony to establish a violation. One such rule is the requirement that a physician obtain a drug screen if he "reasonably believes" that the patient is suffering from substance abuse or that he is diverting controlled substances.[17] That rule, however, is not at issue.
Returning to the instant situation, as noted above, the charges before the Board in this case clearly are not ones requiring expert testimony. Although Dr. Armstrong acknowledges that the Pain Rules require documentation of certain matters, he nonetheless argues that the rules do not define how such documentation must be done. He further argues that an expert in pain management, which he stresses none of the Board members possess such expertise, was necessary to detail to the Board how such documentation must be done. We find Dr. Armstrong's argument that the Board needed pain management specialists to inform them what its documentation requirements mean in practice unpersuasive. See Hebert v. Louisiana State Racing Comm'n, 476 So.2d 823, 825 (La.App. 4 Cir.1985)(rejecting complaint that "scientific experts did not in his case tell the commission what it already knew"); Reaux, XXXX-XXXX at p. 7, 850 So.2d at 728 (noting that "[u]nlike a jury of laypersons, a board made up of physicians is able to evaluate medical issues without the assistance of expert testimony").
Dr. Armstrong still further argues that he followed the documentary requirements of the Pain Rules by having his patients sign a Pain Management Agreement, which satisfied several of the documentation requirements at issue. As noted earlier, Dr. Armstrong made multiple references to that Agreement in his testimony at the hearing. Although he claimed the Agreement was part of his original records, he failed to introduce his original patient records at the hearing. The Agreement was thus not part of the record and is not properly before us. Dr. Armstrong's reliance on the Agreement as satisfying the Pain Rules at issue is thus misplaced.[18]
*843 We further find, as the Board argues, that Dr. Armstrong's testimony before the Board was inconsistent in several respects. First, as noted above, Dr. Armstrong's testimony that the medical records introduced were incomplete in that they do not include the Pain Management Agreement was inconsistent with his testimony that he did not start using the Agreement until around 2001. Another inconsistency in his testimony was that he initially denied consulting with other doctors regarding whether they were treating his patients, yet he subsequently testified that he and his staff did contact other doctors to determine if the patients were "double-dipping." The Board had the opportunity to judge Dr. Armstrong's credibility first-hand at the hearing, and we are required to give due regard to the Board's determinations on such credibility issues. La. R.S. 49:964(G)(6).
In conclusion, our review of the documentary evidence the Board presented and Dr. Armstrong's testimony at the hearing supports the Board's finding that the documentary requirements of the Pain Rules were violated in numerous respects. We thus find that the Board's decision that Dr. Armstrong violated the Pain Rules in numerous respects is "supported and sustainable by a preponderance of evidence." La. R.S. 49:964(G)(6).

SANCTION
Turning to the sanctions issue, Dr. Armstrong assigns as error the Board's imposition of an excessive and unreasonable sanction for his violation of documentation requirements. He argues that in several similar cases the Board has imposed significantly less severe sanctions on physicians found guilty of significantly more severe charges. We rejected a similar argument in Hughes v. Louisiana State Bd. of Dentistry, 490 So.2d 1097 (La.App. 4 Cir.1986), reasoning that "the mere circumstances that a lesser penalty has been imposed in one other case ... does not amount to a showing that defendant's penalizing of plaintiff was `arbitrary or capricious or abuse of discretion or clearly unwarranted exercise of discretion.' " Hughes, 490 So.2d at 1103 (quoting Sturrock v. Louisiana State Racing Comm'n, 437 So.2d 357 (La.App. 4 Cir. 1983)).
Dr. Armstrong next argues that the appropriate sanction should have been similar to that imposed in Holladayi.e., a three month suspension and three year probation. Conversely, the Board cites this court's reasoning in Holladay as supporting the Board's sanction. Our reasoning, which the Board cites, was that given the Board could have legally revoked Dr. Holladay's license, its selection of an "extraordinarily lenient" sanction did not indicate that the Board's sanction was arbitrary or grossly disproportionate to the offense. Likewise, the Board notes that the same option of revoking Dr. Armstrong's license was available in this case and that the Board's sanction it imposed was not disproportionate to the offense.
Addressing a similar argument based on Holladay, we recently reasoned in Reaux, supra, that:
[S]eldom are two cases truly identical in their facts, and the penalty imposed in each case must be judged in light of the facts peculiar to that case. The Board may have viewed the infractions for Dr. Reaux as more egregious than those of the Holladay case. The Board's opinion below notes that the Board had previously disciplined Dr. Reaux in connection with his medication prescriptions; whereas, in Holladay, the physician involved apparently had not been previously disciplined.
*844 XXXX-XXXX at p. 9, 850 So.2d at 729. The same distinction is present in this case. Dr. Armstrong, like Dr. Reaux, has been previously disciplined by the Board. Although Dr. Armstrong challenges the correctness of the Board referencing his two prior disciplinary infractions, which he emphasizes were unrelated to the instant case, he failed to cite any authority precluding the Board from considering such past infractions. Indeed, logic dictates that the Board consider such past infractions to determine if they show a pattern.
Finally, we find Dr. Armstrong's reliance on the fact that there was no harm to the patients involved in this case as warranting a lesser sanction is misplaced. Indeed, we rejected a similar contention in Walker v. Louisiana State Bd. of Med. Examiners, 94-0040, p. 5 (La.App. 4 Cir. 5/26/94), 638 So.2d 350, 352. In that case, Dr. Walker argued that the Board's discipline was arbitrary because there was no evidence any of his patients were harmed by his prescriptions. Agreeing with the Board's argument that its purpose is to stop inappropriate medical practices before patients are harmed, we held that evidence of patient harm is not required when controlled substances are involved. Such is the case here.
Accordingly, we find Dr. Armstrong's argument that the sanction imposed on him was disproportionate unpersuasive.

DECREE
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Although the complaint listed fourteen patients, the counts as to two patients were dismissed, and the count as to one patient did not involve the Pain Rules. As to the latter patient, the complaint alleged an additional charge regarding Dr. Armstrong's practicing medicine during his six-month suspension period in 1999. The Board found he was not guilty of that charge. Hence, this appeal relates only to the charge of violating the Pain Rules in the treatment of eleven patients.
[2] The Pain Rules enumerate two types of documentary requirements: (1) the prerequisites a physician must comply with before prescribing controlled substances on a protracted basis (Section 6921(A)), and (2) the requirements a physician must comply with in the on-going treatment (Section 6921(B)). The complaint alleged that Dr. Armstrong violated both types of documentary requirements. The pertinent rule is cited and quoted in the footnote following each allegation.
[3] Section 6921(A)(1) presently provides:

Evaluation of the Patient. Evaluation of the patient shall initially include relevant medical, pain, alcohol and substance abuse histories, an assessment of the impact of pain on the patient's physical and psychological functions, a review of previous diagnostic studies, previously utilized therapies, an assessment of coexisting illnesses, diseases, or conditions, and an appropriate physical examination.
In 2000, this provision was amended; as originally enacted in 1997, this provision provided
Assessment of Treatment Efficacy and Monitoring. Patients shall be seen by the physician at appropriate regular and frequent intervals, of no less than 12 weeks, to assess the efficacy of treatment, assure that controlled substance therapy remains indicated, and evaluate the patient's progress toward treatment objectives and any adverse drug effects. During each visit, attention shall be given to the possibility of decreased function or quality of life as a result of controlled substance usage, as well as indications of possible addiction, drug abuse or diversion.
[4] Section 6921(A)(3) presently provides:

Treatment Plan. An individualized treatment plan shall be formulated and documented in the patient's medical record, which includes medical justification for controlled substance therapy. Such plan shall include documentation that other medically reasonable alternative treatments for relief of the patient's non-cancer-related chronic or intractable pain have been offered or attempted without adequate or reasonable success. Such plan shall specify the intended role of controlled substance therapy within the overall plan, which therapy shall be tailored to the individual medical needs of each patient.
[5] Section 6921(B)(1) presently provides:

Assessment of Treatment Efficacy and Monitoring. Patients shall be seen by the physician at appropriate intervals, not to exceed 12 weeks, to assess the efficacy of treatment, assure that controlled substance therapy remains indicated, and evaluate the patient's progress toward treatment objectives and any adverse drug effects. Exceptions to this interval shall be adequately documented in the patient's record. During each visit, attention shall be given to the possibility of decreased function or quality of life as a result of controlled substance treatment. Indications of substance abuse or diversion should also be given. At each visit, the physician should seek evidence of under treatment of pain.
In 2000, this provision was amended; as originally enacted in 1997, this provision provided:
Assessment of Treatment Efficacy and Monitoring. Patients shall be seen by the physician at appropriate regular and frequent intervals, of no less than 12 weeks, to assess the efficacy of treatment, assure that controlled substance therapy remains indicated, and evaluate the patient's progress toward treatment objectives and any adverse drug effects. During each visit, attention shall be given to the possibility of decreased function or quality of life as a result of controlled substance usage, as well as indications of possible addiction, drug abuse or diversion.
[6] Section 6921(B)(3) presently provides:

Responsibility for Treatment. A single physician shall take primary responsibility for the controlled substance therapy employed by him in the treatment of a patient's non-cancer-related or intractable pain.
Although this provision was amended in 2000, the sole change was to add the highlighted word "single." In all other respects, the present provision is identical to the original 1977 provision
[7] Section 6921(B)(5) presently provides:

Medications Employed. A physician shall document in the patient's medical record the medical necessity for the use of more than one type or schedule of controlled substance employed in the management of a patient's non-cancer-related chronic or intractable pain.
[8] Section 6921(B)(6) presently provides:

Treatment Records. A physician shall document in the patient's medical record, accurate and complete records of history, physical and other examinations and evaluations, consultations, laboratory and diagnostic reports, treatment plans and objectives, controlled substance and other medication therapy, informed consent, periodic assessments, and review and the results of all other attempts at analgesia which he has employed alternative to controlled substance therapy.
[9] Section 6921(B)(7) presently provides:

Documentation of Controlled Substance Therapy. At a minimum, a physician shall document in the patient's medical record the date, quantity, dosage, route, frequency of administration, the number of controlled substance refills authorized, as well as the frequency of visits to obtain refills.
[10] The pharmacy survey covered prescriptions by Dr. Armstrong of controlled substances and Soma tablets during the period from August 1, 1998 through August 1, 2000.
[11] Although the record reflects that Dr. Armstrong had an expert present at the hearing, Dr. Armstrong did not call that expert to testify.
[12] For confidentiality reasons, the patients initials are used.
[13] See Russ M. Herman, Louisiana Personal Injury § 4:303 (2000)(citing DiLeo as illustrating the principle that "[d]fferent schools of thought on treatment may be considered in determining the standard of care and whether a breach occurred.")
[14] In Holladay, we noted that the Board introduced into the record copies of the regulations that had been adopted in Texas and California regarding the use of controlled substances to treat nonmalignant pain. We also noted the Board introduced expert testimony regarding those standards. We still further factually distinguished DiLeo in numerous respects, including that Dr. DiLeo maintained appropriate records.
[15] Hake v. Arkansas State Med. Bd., 237 Ark. 506, 374 S.W.2d 173 (1964); Dotson v. Texas State Bd. of Med. Examiners, 612 S.W.2d 921 (Tex.1981).
[16] Even the out of state jurisprudence that Dr. Armstrong cites recognizes that there are several exceptions to the rule that expert testimony is required to establish the standard of care. One such exception is when the alleged violation involves facts or occurrences within the general public's comprehension. See generally James J. Watson, Necessary of Expert Evidence in Proceedings for Revocation or Suspension of License of Physician, Surgeon, or Dentist, 74 A.L.R.4th 969 (1989). This is analogous to the jurisprudence recognizing that while ordinarily expert testimony is required to establish the standard of care in a medical malpractice case, there are instances in which expert testimony is not necessary. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992, p. 9 (La.10/17/94), 643 So.2d 1228, 1233-34. One such situation is when "the alleged negligence consists of violating a statute and/or the hospital's bylaws." Id. (citing Hastings v. Baton Rouge General Hosp., 498 So.2d 713, 722 (La.1986)) In Hastings, supra, the Louisiana Supreme Court held that expert testimony was not required to establish the standard of care for a hospital and its physicians regarding the duty to provide emergency services without regard to the patient's ability to pay given that such standards were clearly set forth in the statutes and the hospital's bylaws. Id. In Pfiffner, the Louisiana Supreme Court further explained its holding, stating: "there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof." Pfiffner, 94-0924, 94-0963, 94-0992 at pp. 9-10, 643 So.2d at 1234.
[17] Section 6921(B)(2) of the Pain Rules presently provides:

Drug Screen. If a physician reasonably believes that the patient is suffering from substance abuse or that he is diverting controlled substances, the physician shall obtain a drug screen on the patient. It is within the physician's discretion to decide the nature of the screen on the patient. It is within the physician's discretion to decide the nature of the screen and which type of drug(s) to be screened.
[18] Although we granted the Board's motion to strike the copy of that Agreement that Dr. Armstrong attached to his brief, we note, as the Board contends, that even assuming we could properly consider it, Dr. Armstrong testified that he did not begin using this Agreement until 2001, which was after most of the time frame at issue in this case, 1997 to 2001. (As stated on the pharmacy surveys, the pertinent period examined in that survey was from August 1, 1998 through August 1, 2000.) Indeed, the copy of the Agreement he proffered for L.C. is dated September 28, 2001. Hence, as the Board emphasizes, even if we were to consider this Agreement, it would not help Dr. Armstrong's case.