ARMSTRONG, Chief Judge.
h David M. Jarrott, M.D. (Dr. Jarrott) appeals from judgments of the trial court. In 2004-CA-1714, Dr. Jarrott appeals the trial court judgments of March 19, 2004 and May 12, 2004, denying Dr. Jarrott’s request for declaratory judgment, preliminary and permanent injunctive relief from a disciplinary decision rendered by the defendant/appellee, Louisiana State Board of Medical Examiners (the Board).
In 2007-CA-0516, Dr. Jarrott appeals the trial court judgment of January 9, 2007, affirming the Board’s ruling and rejecting Dr. Jarrott’s challenge to the terms and conditions of probation ordered by the Board following an administrative hearing[1].
The complaint alleged in Count One that Dr. Jarrott’s clinical judgment, medical management, treatment and controlled substance prescription practices with respect to his patient, K.S., are demonstrative of medical practice that fails to satisfy the prevailing and usually accepted standard of practice in this state, are | ^evidence of professional and medical incompetence, were without legitimate medical justification, and violated the Board’s pain medication guidelines.
In Count Two, the Board charged Dr. Jarrott with having violated its Pain Management Rules (the Pain Rules) governing the prescription of controlled substances employed in the treatment of noncancer-related, chronic or intractable pain. Any violation or failure of compliance with a provision of the Pain Rules, as found in 46 La. Adm.Code §§ 6915-6923 (June 1997)[2] is deemed to be a violation of La.R.S. 37:1285 A(6) and (14), providing cause for the Board to suspend, revoke, refuse to issue, or impose probationary or other restrictions on any license held or applied for by a physician to practice medicine in this state.
Dr. Jarrott was charged with violation of 46 La. Adm.Code § 6921 B requiring that, if the physician reasonably believes that his patient is suffering from addiction or drug abuse, he shall obtain a drug screen *530 on the patient. It is within the physician’s discretion to decide the nature of the screen and which type or types of drugs are to be screened. Evidence or behavioral indications of addiction, drug abuse or diversion of controlled substances by a patient being treated for chronic or intractable pain shall be followed by tapering and discontinuation of controlled substance therapy, and referral to an addiction medicine specialist, a pain management specialist, a psychiatrist, or other substance abuse specialist, or by an immediate referral to an addiction medicine or other substance abuse specialist for treatment. 46 La. Adm.Code § 6921 C provides that controlled substance therapy 13shall thereafter be reinitiated only upon the written concurrence of a pain management specialist based upon his physical examination of the patient and the review of the referring physician’s medical records.
The Board charged that Dr. Jarrott’s knowledge of K.S.’s drug addiction and abuse is undeniable, and that, despite that knowledge, between June and September of 1977, when the Pain Rules had been promulgated and were in effect, he did not order a drug screen, taper and discontinue controlled substance therapy or refer her to a pain management specialist for evaluation, all in violation of the Pain Rules.
On October 25, 1999, the Board served by certified mail, return receipt requested, notice of its complaint together with an opportunity for Dr. Jarrott to be heard and present evidence in his defense. Discovery was held in the administrative proceeding, and during the course of the extensive discovery process, the Complainant, Dr. John Bobear, filed a Motion to file a restated Supplemental and Amended Administrative Complaint, which was granted by the Presiding Officer on March 28, 2001.
The Supplemental and Amended Complaint restated the allegations of the Original complaint, and alleged the following additional facts:
—-Dr. Jarrott did not create a treatment plan that properly included the use of nonaddictive modalities, nor did he consult or refer K.S. to an appropriate specialist or specialists.
14 — Dr. Jarrott failed to follow up properly after an emergency physician referred K.S. to a psychiatrist at Charity Hospital, New Orleans (Medical Center of Louisiana), who refused to admit the patient for a work-up desired by Dr. Jarrott.
—Dr. Jarrott failed to take proper steps to ascertain that K.S. was in fact a drug-seeking patient and that she was in fact obtaining controlled substances illicitly and/or from other physicians.
—Dr. Jarrott did not follow through with toxicological studies (such as a drug screen) on K.S., nor did he take appropriate steps when she repeatedly refused the drug screen.
■ — Dr. Jarrott failed to give proper weight to the patient’s mother’s observations, requests and warnings.
—A medical review panel, consisting of three neurosurgeons, unanimously found that Dr. Jarrott breached the standard of care in his treatment of K.S.
In Count Two, the Board alleged the following additional violations[3], providing lawful cause for the suspension of Dr. Jar-rott’s license to practice medicine in Loui *531 siana, pursuant to La.R.S. 87:1285 A(6)[4], (12)[5], and (14)[6]:
—Dr. Jarrott’s clinical judgment and management of K.S., including his failure to pursue a diagnosis of the underlying cause of the patient’s complaints, establish a plan of treatment, refer her to other consultants for evaluation and/or 1 r,treatment, sufficiently employ therapy alternative to controlled substances, and his failure to obtain or heed the patient’s known history of addiction and substance abuse, constitute continuing medical practice that fails to satisfy the prevailing and usually accepted standards of medical practice in this state, and evidences professional or medical incompetence.
—Dr. Jarrott was apparently indifferent to the contraindications, warnings, and dangers of continuing therapy to a patient with a history of drug addiction, abuse and repeated overdoses. By his personal knowledge, as well as the reports of his employees, patients and the patient’s mother, he was aware of the extent of KS.’s addiction, use and abuse of medication. In light of these facts, his prescription practices were in amount, frequency, and duration, without any legitimate medical justification and in contravention of the known warnings, dangers, and contraindications pertaining to such medications.
—Dr. Jarrott’s failure to order or failure to follow through on a drug screen for the patient, failure to create a treatment plan properly including non-addictive modalities, failing to consult or refer to an appropriate specialist(s), failure to follow up on psychiatric care, failure to understand or control the patient’s supply of controlled substances, and failure to address the family’s warnings and observations, demonstrated ongoing breaches of medical standards and medical incompetence.
lfiThe record contains an undated Answer to the Supplemental and Amended Complaint signed and filed by prior counsel to Dr. Jarrott. The Answer admits the following:
1. The initial allegations concerning his status and areas of practice; that K.S. was his patient and died;
2. The facts as stated concerning K.S.’s initial visit and the results of her October, 1993, MRI;
3. That in October, 1996, he employed K.S. as alleged by the Board;
4. That he terminated K.S. as an employee in May, 1997, but continued to serve as her physician;
5. That he prescribed medications to K.S.;
6. KS.’s 4/30/96 Overdose and its aftermath as alleged in the complaint;
7. KS.’s 5/12/97 Overdose on Lorcet, her disorientation, shaking, and her collapse in Dr. Jarrott’s office;
8. Dr. Jarrott gave a prescription on September 2,1997; and
9. The medical review panel unanimously found that Dr. Jarrott breached standards of care in his treatment of K.S.
Dr. Jarrott either denied or denied for lack of sufficient information to justify be *532 lief the remaining allegations of the Supplemental and Amended Complaint.
Dr. Jarrott’s answer also contended that:
1. He had no knowledge of the occurrences alleged in the complaint;
|72. At the time of treatment, there was no standard of conduct such as was promulgated in the 1997 Pain Rules;
3. The Board is precluded from complaining about his prescriptive practices because it and its agents had reviewed those practices in 1992-1996 and did not file a complaint[7];
4. There is a conscious and intentional effort on the part of the complainant, Dr. Cecelia Mouton, and the Board to sanction only those physicians who treat pain patients, and not those who under-treat pain patients, creating a denial of equal protection to physicians and their patients.
|sDr. Jarrott also brought motions to recuse the members of the Board, Dr. *533 Mouton, Dr. Bobear, attorneys Byron Berry and Lawrence McNamara, the Board’s trial counsel, and their law firm, Adams & Reese, which motions were denied.
The Board again amended its Complaint. According to the Board’s Opinion and Ruling, this amendment added charges arising out of Dr. Jarrott’s treatment of two other patients, T.D. and R.G.[8] This Supplemental and Amended Complaint reurged violations of the Pain Management Rules, as applicable from the beginning of Dr. Jarrott’s treatment of T.D. and R.G.
The Second Supplemental and Amended Complaint made the following allegations concerning Dr. Jarrott’s treatment of T.D.:
Dr. Jarrott initially saw T.D. on September 30, 1999. She presented as a five foot six inch tall female, weighing 125 pounds and complaining of right shoulder and lower back pain after a fall. She had a history of a motor vehicle accident seven months earlier producing an intraorbital fracture on the left requiring surgery, and a shoulder dislocation in 1989 producing symptoms similar to those she complained of to Dr. Jarrott. By mid-2000, Dr. Jar-rott began to see T.D. regularly at two to four week intervals. Her diagnosis included occipital neuralgia and headaches, a herniated cervical disc, and post lumbar surgery. His treatment regime included Oxycontin, Methadone, Lortab, Norco, Valium, Xanax and Soma. He also initiated treatment with Neurontin and Dilantin and a short course of treatment with Pamelor. The Board charged that the controlled substances and 19medications exceeded any legitimate medical justification or were prescribed or dispensed in other than a legal or legitimate manner.
During the time T.D. was under Dr. Jarrott’s care, she had multiple imaging studies of her cervical spine revealing a mild herniated disc at C5-6 and bulging discs at C4-5 and C6-7. A myelogram of the cervical and lumbar spine revealed defects in both regions. A CT scan of her head and an electromyogram/nerve conduction study were normal.
On May 17, 2001, on referral from Dr. Jarrott to Dr. Amilcar Correa, she underwent an anterior cervical discectomy and interbody fusion and an internal fixation with blackstone anterior cervical plate system.
During the course of her treatment with Dr. Jarrott, T.D. repeatedly requested early refills for controlled substances, which Dr. Jarrott routinely granted. She became increasingly depressed, a condition exacerbated by the deaths of her brother and her best friend, both of whom died under suspicious circumstances. Dr. Jar-rott was made aware that T.D.’s sister was selling Oxycontin prescriptions, but neither investigated nor evaluated whether T.D. was diverting or abusing the medications he was prescribing for her.
T.D.’s medical records reveal that she visited the Chalmette Medical Center Emergency Room on several occasions supposedly because of seizures. Not one of the seizures was witnessed by a health care professional. The nurses’ notes indicate she appeared drowsy and had slurred speech. An ER physician opined that the seizure was in fact a barbiturate overdosé. Dr. Jarrott was aware of these |10ER visits and treated her with Tegretol without having performed any type of evaluation. He did not investigate or evaluate whether her seizures were episodes of overmedication *534 from the controlled substances he had prescribed for her.
On December 15, 2001, while still under Dr. Jarrott’s care, T.D. died of an apparent drug overdose.
In violation of § 6921 A of the Board’s Pain Rules, Dr. Jarrott failed to perform or to record on T.D.’s chart a medical diagnosis indicating not only the presence of noncancer-related chronic or intractable pain, but also the nature of the underlying disease or pain mechanism, if determinable, prior to or at any time during his treatment. In violation of the same Rule, Dr. Jarrott failed to establish or fully document in T.D.’s chart an individualized treatment plan prior to or at any time during his treatment.
In violation of § 6921 B of the Board’s Pain Rules, Dr. Jarrott allegedly:
1. Failed to see T.D., or to document on her chart that he saw her, at appropriate regular and frequent intervals in order to assess the efficacy of treatment, assure that controlled substance therapy remained indicated, and evaluate her progress toward treatment objectives as well as to evaluate any adverse drug effects;
2. Failed to obtain, or to document on her chart that he obtained, a drug screen after it became apparent that T.D. was suffering from addiction or substance abuse or that she was diverting controlled substances;
• In3. Failed to consult with one or more specialists for additional evaluation and/or treatment in order to achieve the treatment objectives regarding T.D. or to document in her chart the reason such a consultation was not obtained;
4. Failed to document in T.D.’s chart the medical necessity for the use of more than one type or schedule of controlled substance;
5. Failed to document and maintain in T.D.’s chart accurate and complete records of history, examinations, evaluations, consultations, laboratory and diagnostic reports, treatment plans and objectives, controlled substance and other medication therapy, informed consents, periodic assessments, and/or reviews and the results of all other attempts at analgesia he employed as alternatives to controlled substance therapy;
6. Failed to document in T.D.’s record the date, quantity, dosage, route, frequency and number of authorized refills of controlled substances, as well as the frequency of her visits to obtain such refills.
Following seven days of testimony before the Board, covering a period from October 24, 2001 to June 25, 2008, and comprising over 2200 pages of testimony at the Board hearing, and several boxes of documentary evidence[9], the Board issued its ruling, finding Dr. Jarrott guilty of all the charges brought against him. The following language from the Board’s opinion presents a helpful background:
The Board has long since recognized the legitimacy of treating chronic, nonmalignant, intractable pain with controlled substances. Since 1991, either guidelines or rules have been in place for the guidance of medical practitioners in Louisiana. The purpose of the rules is to give doctors clear guidelines so that they could feel comfortable prescribing chronic narcotic therapy to their patients who require such treatment. In fact, they | ^represent what good doctors *535 do every day as they examine patients and make decisions to institute a course of therapy.
We are aware that treatment of non-cancer related chronic intractable pain with narcotic analgesics is fraught with potential problems for the physician. These include dealing with patients who may be drug seekers, and those attempting to obtain drugs through fraudulent means for the purpose of abuse or diversion. Although it is not always easy to identify such patients, certainly, had Dr. Jarrott followed the rules in good faith, and had communicated with other treating physicians, obtained the appropriate medical records, and properly evaluated his patients, the outcomes for two of his patients [K.S. and T.D.] might have been different.
The Board conducted an evidentiary hearing, following which it concluded that Dr. Jarrott was guilty of medical incompetence in the treatment of certain patients, and by ruling dated September 26, 2003, imposed the following sanctions:
(1) Suspending Dr. Jarrott’s medical license for a period of three years, effective ninety days from the effective date of the Board’s decision, to allow Dr. Jarrott an opportunity to refer his patients to other appropriate physicians;
(2) Prohibiting Dr. Jarrott from practicing medicine in the field of chronic pain management. Specifically, at no time following the effective date of the order should Dr. Jarrott hold himself out as being engaged in the treatment of, or actually undertake the treatment of, either individually or in conjunction with another physician, any patient for the long term management of chronic pain (beyond twelve weeks in any twelve month period), nor should he have any ownership interest in, receive any remuneration from or have any association with any clinic or practice which renders care and/or treatment to patients for long term chronic pain management or advertises or holds itself out to the public as a clinic or practice for the care and/or treatment of patients for long term chronic |ispain management. Until or unless modified by the Board, in its sole discretion, the restrictions contained in this provision shall survive the term of probation ordered and remain in force and effect for so long as Dr. Jarrott holds any form of license to practice medicine in the State of Louisiana;
(3) Upon the termination of his suspension, Dr. Jarrott’s license may be reinstated, but shall be on probation for a period of ten years thereafter, subject to whatever terms and conditions the Board may see fit to impose.
(4) Dr. Jarrott was ordered to pay a $5,000.00 fine within ninety days of the opinion’s effective date.
(5) Dr. Jarrott was ordered to pay all costs of the proceeding within ninety days of the opinion’s effective date.
Dr. Jarrott filed an Original, First, Second, Third, and Fourth Supplemental and Amending Petitions pursuant to La. R.S. 49:964 and La.Code Civ. Proc. arts. 3601 et seq. seeking relief from the Board’s administrative review proceeding and its decision of September 26, 2003. The proceedings were filed under No.2003-16065 on the docket of the Civil District Court for the Parish of Orleans.
Dr. Jarrott sought either a stay pursuant to La.R.S. 37:1285, or a preliminary injunction pursuant to La.Code. Civ. Proc., art. 3601.[10] La.R.S. 37:1285 F provides that *536 no injunction or stay of a final board decision or order in an | ^adjudication proceeding shall be effective beyond the earlier of one hundred twenty days from the date the decision or order was rendered, or the date on which the court enters judgment in a proceeding for judicial review of the board’s decision or order pursuant to La. R.S. 49:964 (judicial review of administrative adjudication). The trial court entered a stay order, but did not include an expiration date. The Board filed a Motion in the trial court to conform the stay order to the statutory limit, which the trial court denied. The Board applied to this Court for supervisory review of that denial and, in 2004-C-0323, this Court granted the writ and found that the trial court had not yet rendered a judgment in the juridical review proceeding, and that the one hundred twenty day stay period from the date of the Board’s decision had expired. This Court rejected Dr. Jarrott’s argument that La.R.S. 37:1285 F impinges on the court’s constitutional authority to issue orders in aid of its jurisdiction, having found that the constitutional issue had not been pled specifically in the trial court, and that the Louisiana Attorney General had not been informed of this challenge. Dr. Jarrott reurges his constitutional argument in 2004-CA-1714.
Following a hearing in the district court held on April 29, 2004, the trial judge entered judgment on May 10, 2004, setting aside the Board’s findings and final decision with respect to Dr. Jarrott’s treatment and care of one of three patients at issue, identified herein for privacy purposes as R.G.; reversing and setting aside that portion of the Board’s sanctions barring Dr. Jarrott from having any ownership interest in, receiving any remuneration from, or having any | ^association with any clinic or practice that renders care and/or treatment to patients for the long term management of chronic pain, or advertises or holds itself out to the public as a clinic or practice for the care and/or treatment of patients for the long term management of chronic pain; and reversing and setting aside the $5,000 fine imposed by the Board. On May 12, 2004, the trial court entered judgment denying Dr. Jarrott’s remaining requests for permanent injunctive or declaratory relief.
Following a hearing held in the trial court on July 23, 2004, the trial court granted, in part, Dr. Jarrott’s Motion for New Trial, and by judgment of August 6, 2004(1) reduced the three year suspension imposed by the Board to two years; and (2) remanded the case to the Board with instructions that it set forth in writing and within forty-five days the specific conditions to be imposed during the ten year probationary period. The trial court denied the Motion for New Trial with respect to the remaining issues raised by Dr. Jar-rott.
The Board subsequently issued specific terms for Dr. Jarrott’s probationary period, including:
(1) Fifty hours of continuing medical education annually for the period of the probation;
(2) One hundred hours of community service to be performed annually;
(3) Forfeiture of Dr. Jarrott’s D.E.A. license and a prohibition against prescribing any controlled substance, or the drugs Ultram, Stadel, Nubane, Dalgan, or any generic equivalent;
hii(4) Payment of an annual probation supervision fee of $300.00; and
(5) Payment of all fines and costs previously imposed.
On November 24, 2004, Dr. Jarrott filed his Fourth Amending Petition/Notice of Request for Review from Decision of the Board on Remand Regarding Terms of *537 Probation. Following delays occasioned by the displacements in the aftermath of Hurricane Katrina, the trial court tried the matter and, on January 9, 2007, affirmed the ruling, on remand, of the Board. Dr. Jarrott appeals that judgment in No. 2007-CA-0516.
Dr. Jarrott assigns as error in 2004-CA-1714 the trial court’s denial of his request for injunctive relief. He argues that this denial was based on La. R.S. 37:1285 F, a violation of the constitutional principle of separation of powers. Essentially, Dr. Jarrott seeks to enjoin the application of the one hundred twenty day limitation on the stay of Board rulings because of this alleged constitutional infirmity. The Board contends that this constitutional argument is moot. It is undisputed that Dr. Jarrott’s licensure suspension has expired, and that he has not sought its renewal after expiration of the suspension period. We are guided by the Louisiana Supreme Court’s strong expression concerning mootness in United Teachers of New Orleans v. Orleans Parish School Board, 355 So.2d 899, 900 (La.1978). In that case, a party to an expired contract sued to enforce rights or obligations stemming from that contract. The court held that such a case is moot. The court held:
In such a case the appeal must be dismissed because a judgment, if rendered in favor of the plaintiff, |17could “grant (no) effectual relief whatever....” Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293 (1895). An appellate court must avoid decisions from which no practical results can follow. Pettingill v. Hills, 199 La. 557, 6 So.2d 660 (1942). Moreover, in the interest of judicial economy, the Court may declare mootness on its own motion. LSA-C.C.P. Art. 2164; Behler v. Louisiana State Racing Commission, 251 La. 959, 207 So.2d 758 (1968).
This Court noted in Whitney National Bank v. Poydras Center Associates, 468 So.2d 1246, 1248-1249 (La.App. 4th Cir. 1985):
So strong is this prohibition that an appellate Court, as a matter of judicial economy, has a right to consider the possibility of mootness on its own motion and to dismiss the appeal if the matter has become moot.
In cases of injunctive relief, it is clear that when the activity which a plaintiff seeks to enjoin has already occurred during the pendency of the suit, the matter is moot and the propriety of the trial court’s action in denying or granting the injunction will not be considered by the reviewing court.
This rule was succinctly stated by our Supreme Court in Verdun v. Scallon Brothers Contractors, Inc., 263 La. 1073, 270 So.2d 512 (1972). In that case an injunction was sought to prevent a contractor from trespassing on plaintiffs property to remove soil for the purpose of repairing an adjacent levee. By the time the Supreme Court considered the matter, all construction activities had ceased. The Court dismissed the appeal stating:
“In such circumstances, the matter is now moot, as this court will not review a case where only injunctive relief is sought when the need for that relief has ceased to be a justiciable issue. Injunction, may be used to prevent but not to correct the wrong; it cannot be employed to redress an alleged consummated wrong or undo what has already been done.” Id. 270 So.2d at 513.
This logic has been followed by this Court in Sobolewski v. Brown, 405 So.2d 1254 (La.App. 4th Cir.1981), in which subdivision property owners sought to [18enjoin another owner from construct *538 ing a home in violation of subdivision building restrictions. During pendency of the appeal, the construction was completed. In dismissing the appeal we stated:
“Since the building is now constructed, there is nothing for this court to enjoin; in this appeal it is impossible for us to undo what already has been done; and only abstract propositions, from which no practical result can follow, are left for our decision. It is against the long established judicial policy of this state not to render such advisory opinions.” Id. at 1255,1256.
Applying these principles to the instant case, it is clear that the constitutionality, vel non, of the statutory provision limiting the length of stays of Board rulings to one hundred twenty days is now moot. Dr. Jarrott did not seek renewal of his medical license after the expiration of the statutory period. Therefore, the provisions of the ten year probationary period are no longer in effect. We find, under the specific facts of this case, that there is no justiciable controversy before this Court with respect to the constitutionality of the statutory stay restriction. Pursuant to the authority of the cited jurisprudence, we therefore dismiss the appeal in 2004-CA-1714.
We now address the merits of Dr. Jar-rott’s appeal in 2007-CA-516, which assigns the following alleged errors:
1. The evidence adduced at the Board hearing did not demonstrate any incompetence on Dr. Jarrott’s part, nor did it establish that he breached the standard of care or caused injury to the patients whose cases formed the basis of the Board’s charges.[11]
|1fl2. The Board Director’s position as Investigator and Prosecutor, represented by the Board’s counsel, constitutes an improper conflict of interest and almost ensures that a physician will be disciplined regardless of the evidence presented.[12]
3. The Board’s probation terms were not tailored to the offense or the evidence. The blanket prohibition against prescribing any controlled substances is not supported by the record and violates federal law.
4. The Agency Pain Rules Enforcement Provision exceeded the Board’s authority and violates the Louisiana Constitution.
5. The trial court erred in refusing to allow Dr. Jarrott attorney fees and costs connected with the claim of R. G., which was dismissed, and with respect to the trial court’s reduction of his suspension and remand for specification of the terms of his probation.
Dr. Jarrott seeks reversal of the trial court’s affirmance of the Board’s prohibition against his holding a Drug Enforcement Agency (D.E.A.) license; the terms of his probation, including community service and costs; and his restriction against treating patients with chronic or intractable pain.
*539 The Louisiana Administrative Procedure Act provides at La.R.S. 49:964 G with respect to the district court's review of the Board’s ruling:
The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
| ¡,0(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.
See also, Doe v. Louisiana State Board of Medical Examiners, 00-1987 (La.App. 4 Cir. 5/30/01), 788 So.2d 1234.
Imposition of an administrative sanction is in the nature of a disciplinary measure, and a reviewing court will not reverse the ruling of an administrative agency unless that decision is arbitrary, capricious, or an abuse of discretion. Armstrong v. Louisiana State Board of Medical Examiners, 03-1241, p. 10 (La.App. 4 Cir. 2/18/04), 868 So.2d 830.[13] An agency’s experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence and, accordingly, in our review of administrative actions, we recognize the strong presumption of validity and propriety in such administrative actions where casting judgment upon the professional behavior of a fellow member of a 12iprofession is a matter peculiarly within the expertise of an agency composed of members of that profession. Pastorek v. Louisiana State Board of Medical Examiners, 08-0789, p. 3 (La.App. 4 Cir. 12/17/08), 4 So.3d 833, 836, citing Armstrong, supra at pp. 10-11, 868 So.2d at 838. Furthermore, given the presumption of correctness, the appellant, in this case Dr. Jarrott, bears the burden of proving that the record contains no facts to ■ establish the validity of the charges levied against him. Id. at pp. 3-4, 4 So.3d at 837, citing Armstrong.
The standard of care pertinent to this case is established, in part, by the requirements enumerated in the Board’s guidelines adopted in 1991 and in the Pain Rules as adopted and amended. The Pain Rules are self-proving and have the force of law. Id., at p. 6, 4 So.3d at 838, citing Armstrong; see also, § 6923 of the Pain Rules providing that any violation of or failure to comply with Pain Rule provisions shall be deemed a violation of La.R.S. *540 37:1285(6) and (14), and cause for suspension of a physician’s license to practice medicine.
As this Court noted in Pastorek:
The Board is made up of physicians and is statutorily authorized to rely upon its own medical expertise, La.R.S. 49:956(3), and, unlike a jury of laypersons, a panel of physicians are able to evaluate medical issues without the assistance of expert testimony.
Acting in his official capacity as Investigating Officer, appointed by the Board with respect to the Matter of Dr. Jarrott, John B. Bobear, M.D. (Dr. Bobear) filed Administrative Complaint 99-A-019 on October 19, 1999. Philip 0. Bergeron of Adams and Reese, L.L.P. was noted as Complaint Counsel. This complaint charged that Dr. Jarrott’s clinical judgment, medical management, treatment and controlled substances prescription practices with respect to his Impatient, K.S., demonstrated medical practice that fails to satisfy the prevailing and usually accepted standards of practice in Louisiana, evidenced professional and medical incompetence, and were without legitimate medical justification and in violation of the Board’s rules.
As to Count One of the Complaint, the record shows that on K.S.’s first visit to Dr. Jarrott, on July 18, 1995, she presented as a five foot two inch tall patient weighing one hundred seven pounds, complaining of low back pain from a 1993 work-related injury, neck pain, headaches, nausea and pain radiating into her left leg. An MRI of the lumbar spine taken in 1993 revealed a small midline and slightly to the right of midline protrusion of an interver-tebral disc, extending just to the anterior aspect of, but not deforming, the thecal sac. Despite the fact that several of TLS.’s reported complaints could not be attributed to a single spinal lesion, Dr. Jarrott took no further steps to diagnose the etiology of her complaints by diagnostic or other means, nor did he refer her to any other specialists for evaluation. Instead, he diagnosed her with lumbar spine disc syndrome at the L4-5 level, declared her disabled and began a course of controlled substance therapy that did not abate until her demise over two years later.[14] K.S. was taking Valium, Serzone, and Lorcet 10, the latter, three per day for six months, at the time she initially saw Dr. Jarrott. At the initial visit, he prescribed 30 Lorcet 10, a muscle relaxant drug, and 60 Soma 350, with no refills, and asked K.S. to return in two weeks. The chart does not reflect any examination or findings relative to KS.’s complaints of nausea and headaches. The chart did not note the name(s) of the physician or physicians who had been treating K.S. for her injury, nor was there |asany indication that medical records of that treatment had been sought or obtained. This evidence supports the Board’s complaint that prior to initiating controlled substance therapy, Dr. Jarrott neglected to investigate or obtain any historical information respecting the patient’s substance abuse history.
Had Dr. Jarrott contacted K.S.’s prior treating physician(s) and/or checked her hospitalization records, he would have discovered a plethora of information just within the year prior to his treatment, which should have been a cause for concern to any physician managing a patient’s complaints of pain:
*541 From North Oaks Medical Center’s records:
4/23/94 Accidental overdose of Lorcet; Depression
&⅞/94 Severe overdose; Chronic Depression with previous suicide attempt
5/16/95 Overdose/friend states K.S. went in to take final examinations and she was just sitting there and shaking; took 4 Tylenol No. 3 at noon today; slurred speech, shaking. Dx — drug overdose
5/23/95 Overdose/respiratory arrest due to overdose
K.S. called Dr. Jarrott on July 27, 1995, seeking more Lorcet 10, which Dr. Jarrott denied until her next visit. She did not return until October 17, 1995, when she complained of low back pain, right leg numbness, neck pain, and pain radiating into the left leg. The chart shows she was receiving Desyrel from psychiatrist, Dr. Taylor. Following a physical examination, Dr. Jarrott diagnosed an L4-L5 disc rupture, with left L4 radiculopathy and reactive depression. He testified that the latter diagnosis reflected his belief that she was receiving counseling and/or medication for the depression that arose from her chronic pain. He prescribed 10 | ^Lorcet Plus, with two refills, and 20 Soma 350 with two refills, and asked her to return in six weeks. The chart does not reflect that he sought information from Dr. Taylor.
Six days after the office visit, K.S. called claiming she had lost her Lorcet Plus, and requesting more. Dr. Jarrott denied this request, but granted her subsequent request for 20 Lorcet Plus and 20 Soma 350 on December 7, 1995. He denied another request on January 2, 1996, and advised K.S. to come to his office.
Two days later, she presented at Dr. Jarrott’s office complaining of low back and left leg pain. The chart reveals that she was taking Naprosyn, Ultram, a nonnarcotic pain medicine, and Desyrel for depression and chronic pain, which Dr. Jarrott testified he believed had been prescribed by Dr. Taylor. Dr. Jarrott noted that K.S. was, at that time, totally and permanently disabled as a result of the 1993 accident, and prescribed 60 Lorcet Plus, 60 Soma 350, 20 Dalmane for insomnia, 16 Decadron for the left leg pain, and nausea medications. He also gave K.S. exercises to relieve the pressure on her sciatic nerve.
Two weeks later, on January 18, 1996, the chart note reflects that her pain was persisting. Dr. Jarrott ordered an MRI and prescribed 60 Lorcet Plus, and 60 Soma 350. A chart note on January 23, 1996 states, “[H]er substance abuse is not a factor except in producing anxiety in her mother.” On January 24, 1996, K.S. appeared at Dr. Jarrott’s office, complaining of lower back and bilateral leg pain. He examined her, with findings similar to his previously noted conclusions, and prescribed 30 Lorcet Plus, 60 Soma 350, and 100 Clonadme. He noted on the chart that KS.’s mother confiscated her pain medication “due to fear of her resorting to an overdose to relieve her pain (as nearly happened twice in the recent past).” This note is consistent with the Board’s charge that on January 18, 1996, |¡.rK.S.’s mother advised Dr. Jarrott that she had confiscated the pain medication he had prescribed for fear of another overdose as had occurred on two recent occasions, and implored him not to prescribe any more drugs for her daughter.
On January 31, 1996, K.S. was taken to an emergency room for an overdose of controlled substances.
On February 29, 1996, Dr. Jarrott again prescribed pain medication. K.S. next visited the office on March 21, 1996, with the same complaints. She reported an orthopedic evaluation at Lallie Kemp Hospital, where she received physical therapy. She stopped the therapy, claiming it was causing her more pain. Dr. Jarrott gave her 60 Lorcet Plus and 60 Soma 350 with one refill each.
*542 On April 4, 1996, Dr. Jarrott prescribed 30 Lorcet Plus at KS.’s request.
Nearly a year after having initiated controlled substance therapy on K.S., an April 6, 1996 MRI revealed a mild/small mid-line protrusion causing mild impression on the thecal sac. No stenosis or torminal narrowing was identified. Dr. Jarrott did not use the MRI results as a basis for further diagnostic work-up or treatment. After having received the MRI results, Dr. Jar-rott failed to recommend a plan to treat K.S. or to further refine the etiology of her complaints. He neither recommended nor pursued myelography or post-myelographic CAT scan, nor did he avail himself of any other diagnostic study to diagnose the degree, if any, of compression of the thecal sac or the site of any nerve root compression that may have existed. Throughout the course of the remainder of his treatment of K.S., Dr. Jarrott failed to undertake or to recommend any further diagnostic study. Other than a trial of an anti-inflammatory (Naprosyn), beginning on January 24, 1996, and a short trial of muscle stimulator treatments beginning on February 20, 1997, that caused the patient to report additional pain resulting in his prescription of | ^Morphine, Dr. Jarrott did not recommend any treatment alternative to controlled substances to address or alleviate the patient’s complaints over the more than two years she was under his care. It is reasonable to conclude from these facts that Dr. Jarrott’s diagnosis of KS.’s complaints was predicated solely on his examinations, two MRIs and his treatment, aside from the previously mentioned efforts, consisted exclusively of controlled substances.
On April 30, 1996, KS.’s mother called Dr. Jarrott to report that K.S. was in the Lallie Kemp Emergency Room suffering from an overdose of pain medication and Soma. Dr. Jarrott testified that he spoke to the emergency room physician and told him he wanted a seventy-two hour psychological evaluation of K.S. The emergency room physician noted that conversation as follows: “Spoke with Dr. Jarrott, patient’s neurosurgeon. She has ruptured disc in back which will need surgery. Says patient has long history of drug and alcohol abuse. She called office yesterday requesting 20 Lorcet says she has plenty at home. Says she’s very manipulative with chronic depression. Believes this was not accidental drug ingestion.” Dr. Jarrott’s notes state that he requested the evaluation, and that K.S. was transferred to Charity Hospital in New Orleans, where it was felt that the admission was not necessary. There is no indication in the record that Dr. Jarrott followed up to order the patient’s psychiatric evaluation.
On June 17, 1996, K.S. saw Dr. Larry Gerald Ferachi, a board certified orthopedic surgeon[15], for a second opinion concerning the advisability of back surgery. Dr. Ferachi had seen K.S. for a fractured femur as a post-operative patient in 1989. He treated K.S. from September of 1989 to October of 1990. She saw 1 ¡>7Pr. Ferachi’s associate, Dr. Bankston in 1993, and Dr. Ferachi saw her again in 1996. At the 1996 visit, K.S. brought with her surgical reports, X-rays and two MRI scans. His physical examination “revealed good range of motion to the lumbar spine, the flexion extension, left and right lateral deviation, no paraspinous muscle spasm, negative straight leg raise, which was indicative of no indication of any irritation to the sciatic nerve, intact reflexes, intact sensation, and no atrophy.”
*543 Dr. Ferachi testified at the hearing that there had been some discussion with KS.’s mother about some pain medication K.S. had been on, and it was stated that she had an addiction to some pain medication. His recommendation was to get her off of all pain medication. He opined that based on her physical findings, he felt she had no need of back surgery and had no signs of sciatica. At the hearing, Dr. Ferachi reviewed correspondence from Dr. Bankston indicated that the latter’s physical examination of K.S. showed full range of motion in her spine, some tenderness to palpation, but no sciatic tension. Nonetheless, Dr. Bankston stated that he found evidence of some sciatica. Dr. Ferachi recommended discontinuance of KS.’s pain medications, and back exercises, and did not recommend surgical intervention. Dr. Jarrott denied that he was advised of this consultation.
On July 16, 1996, K.S. failed to appear for an appointment, returning on October 1, 1996. At that time, she had settled her workers’ compensation claim, and complained of insomnia and right leg pain, which she was tolerating without medication. Dr. Jarrott gave her 20 Lorcet 10. On October 3, 1996, she called in and Dr. Jarrott gave her 40 Soma Compound (Soma with aspirin), with four refills.
Five days later, she returned, claiming she had fallen in the bathtub. She had a six by eight centimeter bruise on her left buttock. Dr. Jarrett gave her 20 Lorcet [.,R10. On October 28, 1996, she returned, claiming she fell when a chair broke. Dr. Jarrott gave her 20 Lorcet 10, with one refill.
In October of 1996, Dr. Jarrott employed K.S., a social worker by profession, to develop and serve as a group leader for a pain therapy program he incorporated into his neurosurgical practice at his office in Hammond, Louisiana. He employed her on a part-time basis, while she continued as his patient.
On November 21, 1996, KS.’s chart notes that she was on Lorcet 10 (four per day) with back and left hip and left leg pain. She was given 60 Lorcet 10 with one refill, and 60 Soma 350 with one refill.
On December 12, 1996, the chart notes that she called in to say she had bent over and her back “popped”, reporting left leg pain. Dr. Jarrott prescribed a Medrol Dose Pack, 30 Lorcet 10, and 30 Dalmane.
Despite having neglected to investigate her substance abuse history at the beginning of his treatment of K.S., Dr. Jarrott’s records reveal that he became intimately familiar with her history and ongoing difficulties with depression, medication use, abuse/addiction and overdoses by his personal contact with her as well as from reports from employees, patients, and K.S.’s mother as outlined previously in this opinion, and subsequently as follows:
December 23, 1996: an office worker reported to Dr. Jarrott that K.S. appeared at work disoriented, stumbling and with slurred speech. K.S. asked the employee to get muscle spasm medication out of the medication cabinet for her, which the employee refused. That same day, Dr. Jar-rott called in prescriptions for K.S. for 60 Elavil 25, 60 Lorcet 10, and 60 Soma 350, without refills.
| ¡^January 2, 1997: K.S. returned complaining of back, neck and left leg pain, and insomnia. Dr. Jarrott prescribed 40 Elavil 100, 60 Valium 10, and 10 Lorcet 10, for emergency use, only after appropriate notification of her sponsor.
January 17, 1997: Dr. Jarrott called in 20 Lorcet 10 for K.S.
January 23, 1997: K.S. called in complaining of severe left leg pain and back spasms from standing for five to six hours *544 per day. She also said the Valium was not helping. He gave her 30 Lorcet 10 and switched her to Soma 350.
January 30, 1997: K.S. returned to the office complaining of back and left leg pain. She said the Elavil was not helping and that the Lorcet 10, of which she was taking four each day, was not helping and was upsetting her stomach. Dr. Jarrott noted, “She wants to try Methadone,” and prescribed 60 Methadone 10.
February 6, 1997: Dr. Jarrott made a chart note that K.S. was stable on Methadone, and was taking two to three Soma daily. He gave her 60 Soma 350 and 20 Dalmane that day.
February 20, 1997: K.S. visited, advising that she was out of Methadone and Soma. Dr. Jarrott prescribed 60 Methadone 10 and 60 Soma 350. He recommended the trial of a muscle stimulator.
March 13, 1997: K.S. reported a little help from the muscle stimulator, but complained of back and left leg pain. He ordered continuation of the muscle stimulator, and prescribed 60 Soma 350, 20 Dalmane 30, 60 Phenergan 50, and 60 Methadone 10. He increased the dose of Methadone to 20 milligrams, once or twice a day.
March 25, 1997: K.S. reported feeling a foreign body in her eye after a fluorescent light bulb broke near her. Examination did not reveal a foreign body or obvious trauma, only a mild orbicular spasm. The chart contains a note of that | »0same day that K.S. was suffering from migraine-like headaches in addition to her back and left leg pain. Dr. Jarrott gave her 60 Soma 350 and 20 Lorcet 10, with one refill each. A chart note indicates that she was cautioned about addiction, and her signature appears under the words “accepts risk of addiction.”
March 27, 1997: Two days later, a chart note indicates K.S. has to take more medicine due to pain in her eye. Dr. Jarrott authorized a refill at that time.
March 31, 1997: Dr. Jarrott called in prescriptions for 60 Soma 350 and 20 Lor-cet 10.
April 7, 1997: Dr. Jarrott called in a prescription for 12 Lorcet Plus.
April 8, 1997: K.S. returned with complaints of headaches, left leg pain, and post eye trauma pain. No additional medications were prescribed.
April 10, 1997: K.S. returned with the same complaints. Dr. Jarrott prescribed 20 Lorcet 10, with one refill, for the leg pain.
April 24, 1997: K.S. returned, complaining of serious left leg pain. Dr. Jarrott prescribed 30 Lorcet 10, and 30 Valium 10, each with one refill.
May 12, 1997: K.S. was taken by a coworker to North Oaks Medical Center’s Emergency Room after having been found unconscious in Dr. Jarrott’s office, after having taken an overdose of Lorcet. The co-worker was informed by hospital personnel that K.S. had been seen many times for drug overdoses. After this hospitalization, K.S.’s mother again voiced her concern to Dr. Jarrott about the large amount of controlled substances he was prescribing for her daughter.
May 19, 1997: Three patients of the group pain therapy program submitted written complaints to Dr. Jarrott’s staff concerning KS.’s conduct. One reported that while serving as group leader, K.S. had slurred speech; another reported that she appeared to be more medicated than any other member of the group; and Li another reported that K.S. “is loaded to the point I cannot understand her. She is slurring her words and looks dazed.”
*545 May 27, 1997: K.S. returned for an office visit with the same complaints. The chart notes no new injuries, and the note indicates that she had a “seizure” in the office, and had been taken to the emergency room, where the seizure was treated as an overdose. Dr. Jarrott prescribed 100 Phenergan 50 and 12 Lortab 10, to last for two weeks.
Dr. Jarrott terminated K.S. from his employment in May of 1997, but continued to treat her as her physician.
June 5, 1997: K.S. called Dr. Jarrott and reported that Lorcet 10 worked better than Lortab 10, and that she had to take more medicine than anticipated. He called in a prescription of 12 Lorcet 10.
June 19, 1997: Dr. Jarrott called in a prescription for 15 Lorcet 10 and 30 Elavil 10.
July 3, 1997: K.S. called to report that she was out of Lorcet 10.
July 7, 1997: Dr. Jarrott called in a prescription for 20 Lorcet 10.
July 18, 1997: Dr. Jarrott called in a prescription for 100 Elavil 10.
July 24, 1997: Dr. Jarrott called in a prescription for 40 Lorcet 10.
August 5, 1997: KS. presented at Dr. Jarrott’s office with the usual complaints, advising him that she was then under treatment at Lallie Kemp Hospital for depression and was taking Elavil 100 mg. Dr. Jarrott prescribed 100 Lorcet 10, 60 Soma 350, 100 Phenergan 25, and 30 Dal-mane 30. He testified that she had requested a month’s supply of drugs, because she wished to be treated like the other patients, and he gave her the requested supply.
132September 2, 1997: K.S. came to Dr. Jarrott’s office with the usual complaints, and also claiming that she had fallen three weeks earlier and injured her right ankle. Dr. Jarrott prescribed 100 Lorcet 10, 100 Soma, 100 Phenergan 50, and 30 Dalmane 30.
September 16, 1997: K.S. phoned Dr. Jarrott, requesting an early refill of her prescriptions, which Dr. Jarrott granted. She died the next day under circumstances resulting in a coroner’s finding that she died of an overdose of controlled substances.
The record supports the Board’s charge that Dr. Jarrott’s treatment regimen for K.S. included a variety of controlled and other substances, including Lorcet, Hydro-codone, Methadone, Flurazepam, Diazep-am, and Soma. These drugs were prescribed or dispensed in quantifies and strengths that, in quantity, frequency, and duration, exceeded any legitimate medical justification. Dr. Jarrott’s medical records indicate that from October 17, 1995 through September 16, 1997, he prescribed and various pharmacies dispensed to K.S. the following controlled drugs:
Carisoprodol tablets 350 mg. — 1040 tablets
Carisoprodol c ASA TB 325/200 mg.— 260 tablets
Lorcet Plus tablets 7.5 mg. — 342 tablets
Flurazepam Capsules 30 mg. — 220 capsules
Hydrocodone c APAP TB 10/650 mg.— 100 tablets
Lorcet 10 tablets 10/650 mg. — 787 tablets
Diazepam tablets 10 mg. — 120 tablets
Methadone tablets 10 mg. — 180 tablets
Lortab 10 tablets 10 mg. — 10 tablets
lasAmitriptyline tablets 10 mg. — 130 tablets
Amitriptyline tablets 25 mg. — 30 tablets
The pattern of overdosing on controlled substances continued through this period of KS.’s treatment by Dr. Jarrott. The *546 following evidence was introduced from the records of Lallie Kemp Medical Center and North Oaks Medical Center, demonstrating the extent to which Dr. Jarrott’s willful or negligent prescription of controlled drugs to his patient affected her:
7/19/95 (North Oaks) Lorcet/Soma overdose; drug rehabilitation recommended
8/16/95 (Lallie Kemp) Admitted for detoxification from pain medicine abuse; needs to be followed in outpatient detox center
11/14/95 (North Oaks) C/O bizarre behavior. Admits alcohol must have reacted with meds. Patient states addiction to pain medication. Advised to follow up with the Rosenblum Clinic regarding medication dependency and treating physician for long-term management of pain.
1/31/96 (Lallie Kemp) Brought in by parents w/possible OD of Lorcet/Soma. Slurred speech, the patient doesn’t answer questions appropriately. Family states she has history of psychiatric problems and two previous attempts to commit suicide. Dx. — possible attempted suicide.
4/30/96 (Lallie Kemp) Overdose. Found groggy on parents’ porch/states that she took 8 Lorcet and 3 Soma. Awake, lethargic, pupils constricted, very slurred speech. Dx. — suicidal behavior, drug overdose, depression. Spoke with Dr. Jar-rott, the patient’s neurosurgeon. States she has ruptured disc in the back which will need surgery. Says patient has long history of drug and alcohol abuse. She called office yesterday, requesting 20 Lor-cet tabs, she has plenty at home. Says 134she is very manipulative and with chronic depression. Believes that this was not an accidental ingestion.
7/16/96 (North Oaks) Drug O/D [16], took Soma. Confused, unable to answer questions. Patient visibly shaking.
12/28/96 (North Oaks) Found at home confused, slurred speech and ataxic. Denies taking pills — drug tested positive for marijuana, Benzodiazepines, Opiates, Me-probamate, Carisoprodol, Propoxyphene, Hydrocodone and Hydromorphone.
5/12/97 (North Oaks) O/D Lorcet/is disoriented, shakingAollapsed in office.
8/16/97 (Lallie Kemp) Overdose on Soma-took four Soma/got unsteady. Trying to mellow out — not commit suicide. To be admitted by coroner.
The Board charged that Dr. Jarrott was or should have been fully aware of the dangers, warnings and contraindications associated with continuing to prescribe controlled substances to this patient. In continuing so to prescribe, he ignored her long history of depression, including suicide attempts by overdose, her past and current history of substance abuse and her numerous overdoses on controlled substances he had prescribed. He also ignored the fact that K.S. did not follow his instructions for taking medication, and her ingestion of alcohol and illicit substances with such medication. The record supports the conclusion that Dr. Jarrott apparently ignored the reports of his therapy group patients and staff that K.S. exhibited signs and symptoms of substance abuse, and the admonitions Island pleas of KS.’s mother to withhold further prescriptions for fear of additional overdoses.
During the time that K.S. was being treated by Dr. Jarrott, she was also being seen, at varying times, by Dr. James B. Denney, Dr. Taylor, Dr. Kahn (a Lallie Kemp emergency room physician), and Dr. Raborn (a dentist), all of whom prescribed narcotic pain medication for K.S. from *547 time to time. According to his chart, Dr. Jarrott was aware of Dr. Taylor’s treatment of K.S., and of at least three of her thirteen emergency room admissions for apparent overdoses. He knew of and spoke at least twice to KS.’s mother about KS.’s history of drug abuse.
Dr. Jarrott’s chart reveals that K.S. was taking 3 Lorcet, 3 Soma and 100 mg. Ela-vil daily[17]. As a pain management specialist, he knew or should have known that according to the manner in which he prescribed her medication on September 2, 1997, she should have been provided medication therapy for more than a month. Nonetheless, on September 16, 1997, just two weeks later, Dr. Jarrott authorized early refills of each of those three prescriptions. The following day, K.S. died from an overdose. The coroner’s toxicology screen indicated that K.S. tested positive for Amphetamines, Opiates, Benzo-diazepines, Ethanol, and Meprobamate. A subsequent screen showed K.S. tested positive as well for Flurazepam, Alprazolam, Clonazepam, Clorazepate, Diazepam and Triazolam. A coroner’s inventory of KS.’s home at the time of her death discovered Marijuana, 48 of 100 Lorcet 10/650 mg. prescribed by Dr. Jarrott and filled the day before; 6 of 20 Flurazepam 30 mg. prescribed by Dr. Jarrott and filled on December 18, 1996; 13 of 30 Flurazepam 30 mg. prescribed by Dr. Jarrott and filled on September 2, |Sfi1997; 28 of 30 Flura-zepam 30 mg. prescribed by Dr. Jarrott and filled on September 16, 1997; 0 of 30 Soma 350 mg. prescribed by Dr. Jarrott and filled on September 12, 1997; and 96 of 100 Soma 350 prescribed by Dr. Jarrott and filled on September 16,1997.
Dr. J. Carlos Pisarello, of the Tulane University School of Medicine’s Department of Neurosurgery, testified as an expert neurosurgeon[18]. According to Dr. Pisarello, Dr. Jarrott did not establish a correct diagnosis for K.S. at the first visit. Dr. Pisarello also opined that Dr. Jarrott’s diagnosis of a disc rupture at L4-L5 was not consistent with and failed to address KS.’s complaints of headache, neck pain, and nausea. Furthermore, the objective findings relative to her back did not explain the symptoms she related to Dr. Jarrott. Significantly, Dr. Pisarello testified that Dr. Jarrott had no objective basis to prescribe the controlled substances he prescribed upon KS.’s initial presentation. Dr. Pisarello opined that Dr. Jarrott’s treatment of K.S. did not comply with Board guidelines set in 1991[19] for prescribing addicting or dependency inducing drugs in a number of respects:
1. Failure to make a diagnosis supported by history, physical findings, and appropriate tests to justify the prescription of narcotic analgesics.
2. Failure to create a treatment plan including the use of appropriate non-addictive modalities, or to make referrals to appropriate specialists.
3. Failure to attempt to determine that non-addictive modalities of treatment *548 would not work before prescribing controlled substances.
|374. Taking no steps initially to determine if K.S. was a drug seeker, and taking no such steps even after he had reason to believe she was a drug abuser.
5. Failure to obtain an informed consent from K.S. before embarking on a course of treatment with controlled substances.
6. Issuing many prescriptions between KS.’s irregularly scheduled office visits.
7. Taking no steps to insure that he was the only physician prescribing controlled substances to K.S., even after he was aware of the involvement of other physicians.
8. Failure to maintain regular contact with KS.’s family relative to her response to controlled substance therapy, despite having received complaints from KS.’s mother.
9. Failure to have obtained her record from the hospitals where she was admitted despite his awareness of this patient’s drug abuse history.
10. Failure to refer K.S. to a specialist for chronic pain management, preferably to a center where a holistic approach is utilized, once it became apparent that K.S. would not accept surgery.
Dr. Pisarello testified that these guidelines would constitute good medical practice in any situation in treating a patient. He also opined that with all patients suffering from chronic pain of undetermined etiology, as was the case here, it is very important that a holistic approach should be used in which not only psychiatrists, but also physiatrists, rheumatologists, and orthopedic surgeons should have input into the case. Dr. Jarrott, in Dr. Pisarello’s opinion, did not make the proper referrals in the case of K.S. Dr. Pisarello also opined that the history of K.S.’s drug overdoses and hospitalizations should have provided “a red flag to any |aspracticing physician.” He noted that had Dr. Jarrott obtained KS.’s permission to obtain her hospitalization records from Lallie Kemp and North Oaks, where he knew she had been treated, he would have learned the full extent of her history of drug abuse and overdosing on controlled substances.
Dr. Jarrott contends that his prescribed dosages of Lorcet and Soma could not have caused KS.’s overdose of April 30, 1996. Dr. Pisarello testified that if Dr. Jarrott believed that to be the case, the only reasonable explanation for the overdose was that she was receiving medication from another source. That fact alone, in Dr. Pisarello’s medical opinion, would have been sufficient to place Dr. Jarrott on notice that there were other physicians prescribing medications to K.S. The records do not indicate that Dr. Jar-rott questioned K.S. about other possible sources for her prescription drugs. Such questioning, in Dr. Pisarello’s opinion, would have been prudent and medically appropriate.
Dr. Pisarello opined that Dr. Jarrott’s treatment of K.S. harmed her in that it perpetuated her dependency on drugs, when the opposite should have been the course of treatment.
Dr. Raeburn C. Llewellyn, an expert neurosurgeon, testified that he was selected by Dr. Jarrott to serve as a member of the Medical Review Panel that considered KS.’s family’s malpractice claim against Dr. Jarrott. According to Dr. Llewellyn, the panel found unanimously that Dr. Jar-rott’s treatment of K.S. did not meet the applicable standard of care. At least by October of 1996, Dr. Jarrott should have referred K.S. for competent pain manage *549 ment[20]. His conduct was a | ^causative factor in the resulting damage to K.S. to the extent that it contributed to the continued mismanagement of her chronic pain problem.[21]
Dr. Jarrott testified to his belief that he had under medicated K.S., and that had she received sufficient drugs to handle her pain, she would not have resorted to other doctors or to illegal sources to obtain relief. He also maintains that his prescriptions did not exceed the Physicians Desk Reference máximums. However, the record reflects that he was at the very least aware that K.S. was seeing Dr. Taylor, and there is no indication that he contacted that physician to determine whether he was also prescribing controlled substances to K.S. Furthermore, this reliance on the PDR standards ignores the knowledge he obtained from K.S.’s mother about her history of drug abuse and overdoses, as well as the complaints of his office staff and patients concerning K.S.’s appearance, demeanor and behavior, suggestive of drug abuse. A competent physician would have concluded that further investigation of possible other sources of controlled substances would have been in order, and would not have relied simply on the fact that his prescriptions were within PDR limits.
Dr. Jarrott also testified that he believed K.S. was in control of herself when, on August 5, 1997 he gave her a month’s supply of drugs, and, on September 2 and September 16, 1997, when he granted refills. While this physician clearly has a right to his opinion as to her control, his failure to require an office visit for the final extension of refills argues strongly against his medical competence, given the patient’s history while under his care and even in his employ. This activity must be viewed against the background of Dr. Jar-rott’s extensive experience with K.S., | ^including his characterization of her, in April 30, 1996, as having a long history of drug and alcohol abuse, and his statement that K.S. was “very manipulative, with chronic depression.”
Clearly, Dr. Jarrott recognized or, with an appropriate degree of medical competence, should have recognized that K.S. was addicted to prescription drugs. As the Board noted in its findings, two months before K.S. saw Dr. Jarrott for the first time, she saw Dr. Denney, who recognized that she was an addict. Dr. Taylor, who saw K.S. at the same time as Dr. Denney and Dr. Jarrott, characterized her as “drug savvy and drug seeking.” The Board concluded that had Dr. Jarrott inquired of Dr. Taylor, or of the hospitals where K.S. went for overdose treatment, he would have been aware of the full extent of her problem. Referral for a psychiatric consultation in April or October of 1996 would have had a similar result. The board also faulted Dr. Jarrott’s failure to explore her detoxification process, while continuing to prescribe narcotics even after she reported post-detox ability to manage her pain without resort to controlled substances.
Dr. Jarrott did not explain his failure to document all of his prescriptions on KS.’s chart. He admitted to knowledge of her detoxification, but did not chart that fact, *550 nor did he chart his conference with K.S. and her mother concerning the patient’s drug abuse.
Dr. Jarrott presented three expert witnesses whose testimony was accepted and discussed by the Board. James B. Den-ney, M.D., testified both as a fact witness and as an expert. Dr. Denney is Board Certified as a psychiatrist and forensic psychiatrist, whose practice emphasizes pain management. Dr. Denney first saw K.S. on May 25, 1995 at North Oaks, where he provided a consult a few days after her admission for a drug overdose. He treated K.S. for approximately |41 three months, when he learned that she was also being treated by and receiving medication from Dr. Taylor. He confronted her about the fact that she was receiving treatment from more than one physician for her problem, and ultimately dismissed her as a patient. He opined that K.S. was a complex patient, for whom it was difficult both to treat her pain and control her tendency to addiction. After having reviewed Dr. Jarrott’s chart on KS.’s treatment and supporting documentation, he concluded that Dr. Jarrott’s care was within acceptable standards. Presumably, Dr. Denney considered his own action in confronting and dismissing K.S. upon knowledge of her treatment by Dr. Taylor to be in excess of the standard of care. Dr. Denney concluded that he did not believe further psychiatric care would have prevented KS.’s demise, which he characterized as “unfortunately inevitable.”
The Board’s opinion describes Paul J. Hubbell, III, M.D. as a well qualified pain specialist. He opined that Dr. Jarrott’s treatment of K.S. was within acceptable standards of care and that the prescribed medicines were within acceptable dosage and amount levels. While he supported most of Dr. Jarrott’s treatment of K.S., he admitted on cross-examination and on examination by members of the Board that he would have handled her case differently. Specifically, he would have immediately obtained the details of her treatment for an alleged overdose, and would have initiated a psychiatric consult and made use of psychiatric consultation throughout treatment. The overlay of Dr. Jarrott’s knowledge of K.S.’s drug abuse, however, makes the acceptance of the dosages and amounts of prescribed narcotics at least questionable. A competent physician should know that a person he believes to have a long history of drug abuse, and l^who is very manipulative could well have other legal or illegal sources of narcotics, making otherwise appropriate dosages or amounts excessive.
Board Certified Neurosurgeon John D. Jackson, Jr., testified that Dr. Jarrott’s treatment of K.S. was within the standard of care for a neurosurgeon, but that, had he been treating K.S., he would have referred her back to her physician as soon as it became clear that she would not accept surgery.
The Board considered these various expert opinions and the factual evidence and concluded that Dr. Jarrott’s level of practice was sufficiently deficient under the statutory standard that his continuing practice under his license should be limited.
Dr. Jarrott devotes much of his appellate argument to his contention that the coroner’s examination did not determine conclusively that K.S.’s death was caused specifically by an overdose of drugs prescribed by Dr. Jarrott. However, while that issue would be relevant to a causation claim in a malpractice action, it does not determine the outcome of the instant action. At issue is the medical competence or incompetence demonstrated by Dr. Jar-rott in his treatment of K.S., not the causation of her death. In fact, the Board’s *551 findings specifically express no opinion as to whether his treatment of K.S. resulted in her death. The opinion relies instead on his deficiency in documentation, and continuing prescription of controlled substances even after he became aware that K.S. had a drug problem. The Board highlighted the fact that after Dr. Jarrott learned in October of 1996 that K.S. had completed successfully a detoxification program, and was handling her pain well, he started her again on controlled substances. The Board also noted its reliance on the evidence that Dr. Jarrott made no inquiry of any of K.S.’s other doctors or of the medical facilities where she had been treated to learn what they had done for |4aher and what history they had for her. Dr. Jarrott conceded, in retrospect, that these things should have been done.
In light of this record taken in its entirety, we find the Board’s conclusions as to Dr. Jarrott’s treatment of K.S. to be reasonable and supported by a preponderance of the evidence.
Dr. Jarrott’s discussion in brief of the Board’s charges relating to T.D. does not address the evidence adduced at the administrative hearing. Dr. Jarrott claims that the Board’s investigator, Charles Fleetwood, testified that he had investigated a complaint made by T.D.’s fiancé and concluded that it had no merit. Dr. Jar-rott asserts that in meetings with Dr. Mouton and Dr. Bobear, it was decided that the Board would not pursue the T.D. matter. Whether such preliminary discussions and tentative decisions had been held and reached is not dispositive of the issue of the propriety of Dr. Jarrott’s treatment of this patient.[22]
Dr. Jarrott saw T.D. on September 30, 1999, on a referral from an emergency room, where she received Vicodin ES, Soma, and Naprosyn. She complained to Dr. Jarrott of right shoulder and elbow pain, lower back pain, right hand tingling, and headaches. She gave a history of having fallen on her elbow after having tripped on a toy, and a prior history of a motor vehicle accident in 1999 resulting in a left intraorbital fracture with surgical repair. She had a lumbar discectomy at L4-L5 in 1978, and a lumbar discectomy at L5-S1 in 1988. It was noted that T.D. was a smoker. Dr. Jarrott’s appellate brief does not controvert the course of treatment he administered to T.D. as set out in the Board’s charge and [^ruling detailed above, relying instead on the preliminary discussions and conclusion of the Board’s investigators.
Mack Thomas, M.D., who is Board Certified in anesthesiology and general surgery, testified that he served as elected chairman of the Board’s Pain Advisory Committee when it was established in the late 1990s. He was tendered and accepted at the hearing as an expert in the field of anesthesiology and pain management.[23] Dr. Thomas reviewed the chart referring to Dr. Jarrott’s treatment of T.D. The doctor’s records did not reflect an initial physical examination. Dr. Thomas testified that a patient presenting with T.D.’s complaints would require a complete phys *552 ical exam, including examination of the upper and lower extremities. Board counsel then showed him a page that Dr. Jar-rott contends was prepared contemporaneously with T.D.’s visit, noting the results of her physical examination. The notes included an examination of the cervical area, and some examination of range of motion in the lumbar area and of reflexes. There was no mention of tenderness. The notes also included mention of lumbar and thyroid scars, and some right shoulder limited range of motion. Lumbar spine films done in August of 1999 showed mild narrowing of L4-5, L5-S1. Dr. Thomas testified that there seemed to be a note about the right shoulder, high humeral head, and supras-pinatous pathology, but he could not be sure. The notes indicate a treatment plan including range of motion exercise for the right shoulder and treatment with Vicodin and Xanax.
14SDr. Thomas opined that, even assuming that this page of notes was contemporaneous with T.D.’s initial visit, more physical examination would have been appropriate, including forward bending, straight leg raising and similar tests, and more detail to determine what type of pain was being experienced and its cause. Dr. Thomas also opined that the examination was deficient insofar as it should have included an appropriate history indicating what brings about the patient’s pain, her lifestyle issues, sleep habits, activities, and any treatment that relieves her pain.
Dr. Thomas testified concerning evidence in the patient’s initial visit record of Dr. Jarrott’s compliance, vel non, with the following aspects of the pain rules:
1. Accurate assessment of the impact of the patient’s pain on her physical and psychological functioning — no evidence in the patient record of compliance.
2. Discussion with the patient of previously utilized therapies as they relate to her complaints — Dr. Jarrott noted only that T.D. had had three epidurals providing temporary relief and has been using Vicodin.
3. Discussion with the patient of prior alcohol or drug abuse — a note regarding no associate history of drug or alcohol abuse indicates some discussion took place.
4. Consideration of treatment modalities other than controlled substances — a note indicates recommendation of right shoulder exercise, in conjunction with Vi-codin and Xanax, controlled substances. Dr. Thomas testified that he would have suggested walking exercise therapy, and a cessation of smoking, a cause of vasocon-striction. He opined that successful pain management requires having the patient “buy into” her treatment program, not simply prescribing pills or pain blocks.
14fi5. Discussion with the patient relating to the risks of using Vicodin and/or Xanax — no evidence in the patient record of the initial visit of compliance.
6. Obtaining an informed consent concerning those risks, articulated and documented in a written form — no evidence in the patient record of the initial visit of compliance.
Dr. Thomas reviewed the record of T.D.’s office visit on November 18, 1999. He found no evidence of compliance with the Pain Rule requiring that on an interval visit there be an evaluation of the patient as to the efficacy of treatment. Nor is there a record of any discussion with the patient of any limitations or problems that she was having because of her pain. There was no record of the required discussion with the patient of any adverse affects from the use of controlled substances from the initial visit to this visit. There was no note of a discussion with the patient as to any treatment goal relating to her complaints. The only evidence of risk *553 advice is a note indicating that because Vicodin contains acetaminophen, Dr. Jar-rott warned her of Tylenol’s risk factors. It does not appear that Dr. Jarrott gave T.D. any warning concerning her use of opioids until a visit on October 13, 2001, connected with her May, 2001, surgery by Dr. Correa[24]. This initial warning came two years into Dr. Jarrott’s treatment of T.D.
Dr. Thomas testified concerning notes of May 31, 2001, indicating that Dr. Jarrott prescribed including Xanax and Lortab, to T.D. On June 12, 2001, the chart notes “Lillian from Dr. Correa’s office called and wanted to know if [T.D.] was receiving pain medication from Dr. Jarrott. Lillian said that [T.D.] called the office twice that day and said she was in a lot of pain. [T.D.J’s pain- — -Lillian seemed to |47think that her pain is not related to surgery. Also states that their office would no longer be giving [T.D.] pain medication any longer [sic].” On that same day, T.D. visited Dr. Jarrott. Dr. Thomas noted that the record of that visit does not indicate that Dr. Jarrott discussed with his patient the necessity that only one physician be prescribing controlled substances for her pain complaints. Even assuming Dr. Jarrott had not received the message from Dr. Correa’s office at the time of the visit, he would have had the information when he saw T.D. on June 25, 2001. There is no evidence in the notes of the latter visit that Dr. Jarrott undertook the required discussion of the concerns arising out of having more than one physician prescribing controlled substances for a single patient.
By T.D.’s July 17, 2001 visit to Dr. Jar-rott, he was prescribing Oxycontin, Lor-tab, Xanax and Soma. There is no notation on the chart indicating the justification for the use of more than one type of controlled substances for T.D.’s post-operative complaints. There also is no indication as to why Xanax would be appropriate for this patient. Dr. Thomas opined that at this point of time, two months after surgery, with T.D. describing her pain as an “8” on a scale of “10”, Dr. Jarrott should have obtained an evaluation by another pain specialist, a neurologist or a psychiatrist. Furthermore, Dr. Thomas would have tried to make T.D. more active, to find out how she was sleeping, and to determine her exercise regimen.
Dr. Hubbell and Dr. Jarrott testified that his treatment of T.D. was appropriate and within the standard of care. Dr. Thomas’s opinion was accepted by the Board in the reasonable exercise of its discretion. The Board concluded from the testimony and from their own review of T.D.’s chart, that Dr. Jarrott’s treatment |4Rdid not meet the standard of care, either as required by the Pain Rules, or by the standards of good medicine.
We find the preponderance of evidence in the record supports the Board’s conclusions with respect to Dr. Jarrott’s treatment of T.D.
Dr. Jarrott contends that the Board’s probation terms were not tailored to the offense or the evidence, to wit, the blanket prohibition against prescribing any controlled substances is not supported by the record and violates federal law.
In this case, the Board sanction before us is a two year suspension of his license to practice medicine, the maximum fine of $5,000.00, and prohibition of practicing medicine in the field of chronic pain management, either by himself or through as *554 sociation with other physicians practicing in that field. We note that in the Pastorek case previously discussed, under similar facts, this Court approved the Board’s suspension of Dr. Pastorek’s license for three years, imposition of a $5,000.00 fine, and prohibition of Dr. Pastorek’s practice of pain medicine for the remainder of his career. This assignment of error is without merit.
The Board prohibited Dr. Jarrott from prescribing controlled substances and required that he surrender his D.E.A. permit as a condition of his probation and as a precondition to any reinstatement of his medical license. Dr. Jarrott contends that the federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq. places the authority to restrict the right to prescribe controlled substances exclusively with the Attorney General[25] of the United States, who is required to conduct a hearing before an Independent Administrative Law Judge appointed by the United States |4aJustice Department. The Board’s ruling, in Dr. Jarrott’s view, constitutes an improper de facto suspension of his D.E.A. license.
This argument ignores the non-peremption provision of the Controlled Substances Act, which provides in relevant part at 21 U.S.A. § 903 (1970):
No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.
Thus, the Act preempts State regulation of D.E.A. licenses only if and to the extent that such regulation positively conflicts with the Act.
The Act does not restrict the right of state licensing boards to impose on their licensees rules governing their right to prescribe controlled substances. We find no such restriction and Dr. Jarrott has not referred this Court to such a prohibition. We find no positive conflict between the Act and the Board’s rules or procedures in the context of Dr. Jarrott’s case. This assignment of error is without merit.
Dr. Jarrott contends that the Board’s Pain Rules Enforcement Provision exceeded the Board’s authority and violates the Louisiana Constitution. Specifically, he argues that § 6923 of the Pain Rules is in conflict with La.R.S. 37:1285.1.
This Court held in Armstrong v. Louisiana State Board of Medical Examiners, supra at p. 13, 868 So.2d at 839:
15p[T]he Pain Rules, which were adopted pursuant to the [Administrative Procedures Act], are self-proving and have the force of law. The Board’s apparent purpose for adopting these Pain Rules was to alleviate the concerns of physicians over being disciplined for over-prescribing pain medication.
La.R.S. 37:1270 B(6) (“Duties and powers of the board”) empowers the Board to “[a]dopt rules, regulations, and standards necessary to carry out the [B]oard’s duties, powers, and functions provided for in this Part.” La.R.S. 37:1285 (“Causes for nonis-suance; suspension; revocation; or the imposition of restrictions; fines; reinstatement; publication of action; stays”) provides, inter alia, in § 1285 A(6) that the *555 Board may suspend or revoke any license or permit, or impose probationary or, other restrictions on any license or permit issued under this Part for prescribing, dispensing, or administering legally controlled substances or any dependency-inducing medication without legitimate medical justification therefor or in other than a legal or legitimate manner. Furthermore, § 1285 A(12) allows for such discipline for professional or medical incompetence, and § 1285 A(14) allows discipline for continuing or recurring medical practice that fails to satisfy prevailing and usually accepted standards of medical practice in this State. La.R.S. 37:1285 B gives the Board the authority, in instances the Board deems proper, to implement the recited duties and powers by establishing appropriate regulations and standards pertaining thereto. Clearly, enactment of the Pain Rules comes within this statutory delegation of authority.
Within this statutory framework, the Board enacted its Pain Rules. As noted previously in this opinion, the Board recognized that promulgation of pain management guidelines and rules benefits physicians by giving clear guidance in |B1this difficult area of medical practice and their patients. It appears that these rules also benefit patients suffering chronic pain who must, in conjunction with the advice of their physicians, balance the helpfulness of controlled substances in pain management against the risk of dependency and addiction. As the Board argues, the guidelines and rules do not limit or control the physician’s ultimate authority to treat his patient, but define a mechanism by which all concerned can be given some assurance that the physician is following sound medical practice in his prescribing decisions.
Dr. Jarrott contends that the Pain Rules conflict with the provisions of La.R.S. 37:1285.1. That statute provides:
A. All adjudicatory functions of the board, including alleged violations of the provisions of this and any other Chapter administered by the board, shall be heard by a quorum of the board.
B. At the direction of the board, a hearing panel, consisting of one or more board members and totaling less than a quorum, may hear the charges and submit written findings, conclusions and recommendations to the board to consider in arriving at its decision.
C. Having considered the report of the hearing panel, and having reviewed the record of the proceedings, the board may affirm, adopt, modify or reject the findings and recommendations of the hearing panel or it may determine findings and recommendations of its own.
D. The decision of a majority of a quorum shall be adopted as the final decision of the board. A member of the board who serves on a hearing panel shall not participate in the board’s deliberations or final decision with respect to the subject matter of such panel, nor shall said member be considered in determining a quorum for a vote on the final decision of the board.
We find this statute to be irrelevant to Dr. Jarrott’s argument.
|fipDr. Jarrott argues that the Pain Rules violate the Louisiana Constitution; however, he has not indicated any particular provision of the Constitution that might be deemed inconsistent with the rules. Dr. Jarrott argues that La.R.S. 37:1285.2 was a legislative response to the enactment of the Pain Rules, intending somehow to ameliorate the allegedly negative effects of the Pain Rules on medical practice. However, we note that § 1285.2, whatever its intention might have been, was repealed by the legislature by Acts 2005, No. 428, § 3, effective July 1, 2005.
*556 It is clear that the legislature intended to empower the Board to make appropriate rules and regulations concerning physician discipline in the instant context. We find no constitutional or statutory infirmity in the prescription guidelines or their successor Pain Rules that would make their application in this case improper. This assignment of error is without error.
Dr. Jarrott contends that the trial court erred in refusing to allow Dr. Jarrott attorney fees and costs connected with the claim of R. G., which was dismissed, and with respect to the trial court’s reduction of his suspension and remand for specification of the terms of his probation. Fees and costs are governed by La.R.S. 49:964.1 which provides such relief in limited circumstances:
A. If an agency or official thereof, or other person acting on behalf of an agency or official thereof, files a petition for judicial review of a final decision or order in an adjudication proceeding, and such agency, official, or person does not prevail in the final disposition of the judicial review, the agency shall be responsible for the payment of reasonable attorney fees and court costs of the other party. [Emphasis added.]
By the clear terms of the statute, it applies only to cases in which the agency, in this case, the Board, files a petition for judicial review. Under the facts of the 15Sinstant case, it was Dr. Jarrott, and not the Board, that filed such a petition. Attorney fees and costs will not be assessed to a party absent a contractual or statutory basis therefor. See, Dixie Services, L.L.C. v. R & B Falcon Drilling USA, Inc., 05-1212, 06-1209, p. 9 (La.App. 4 Cir. 3/21/07), 955 So.2d 214, 220.
The Board imposed the costs of the administrative proceeding against Dr. Jarrott as provided in La.R.S. 37:1285 C, which provides in relevant part:
The Board may, as a probationary condition, or as a condition of the reinstatement of any license ... suspended or revoked hereunder, require the license ... holder to pay all costs of the board proceedings, including investigators’, stenographers’, and attorneys’ fees, and to pay a fine not to exceed the sum of five thousand dollars.
Contrary to Dr. Jarrott’s suggestion, the statute by its own terms provides for assessment of attorney fees as an element of costs. We find no basis in La.R.S. 49:964 for Dr. Jarrott’s contention that the Board’s imposition of costs, under the circumstances of this case, violated that statute. The Board has not yet held a hearing to determine the appropriate amount of costs and fees and, in light of the pendency of this appeal, is correct in deferring quantification of the amount of fees and costs until the judgments are final and all appeals have been exhausted. Therefore, Dr. Jarrott’s claim that the Board’s costs and fees are not recoverable is contrary to the applicable statute, and his claim that they have been imposed without a proper hearing is premature. This assignment of error is without merit.
For the foregoing reasons, we dismiss as moot Dr. Jarrott’s appeal in 2004-CA-1714, and affirm the district court’s judgment in 2007-CA-0516.
APPEAL IN 2004-CA-1714 DISMISSED AS MOOT; DISTRICT COURT JUDGMENT IN 2007-CA-0516 AFFIRMED.

. The trial court also vacated or amended portions of the Board’s ruling. Because the Board neither answered Dr. Jarrott’s appeal nor appealed the district court’s judgment, those portions of the district court judgment are not before us.

. These rules were in effect during the last three months of Dr. Jarrott's treatment of K.S.

. The Supplemental and Amending Complaint apparently added these violations to Count Two of the Original Complaint that had set forth alleged violation of the Board’s Pain Management Rules in order to cover Dr. Jar-rott's actions prior to the promulgation of the Pain Rules.

.The Board may take action against the license of a physician as the result of prescribing, dispensing, or administering legally controlled substances or any dependency-inducing medication without legitimate medical justification therefor or in other than a legal or legitimate manner.

. The Board may take action against the license of a physician as the result of professional or medical incompetence.

. The Board may take action against the license of a physician as the result of continuing or recurring medical practice which fails to satisfy the prevailing and usually accepted standards of medical practice in this state.

. The record contains a Report of Investigation dated June 6, 1996, in which Dr. John Bobear, as Investigating Officer, reported that a prescription survey was undertaken. Following analysis of the prescription data returned from the pharmacies and the 1992 medical records of twenty of Dr. Jarrott’s patients, fourteen of the patients were of concern to the Investigating Officer. Nearly all of these patients had been referred by orthopedic surgeons following multiple, unsuccessful cervical or lumbar surgeries. While some were treated conservatively and some underwent additional surgery, all were maintained on controlled substances throughout Dr. Jar-rott’s treatment. The survey revealed that, typically, the fourteen patients were maintained on three to four dosage units of opioid therapy per day; in some instances, patients received as many as six dosage units of opioid therapy daily. In a few instances, Dr. Jarrott prescribed a sufficient quantity for as many as ten or more dosage units per day for short periods of time, sometimes in combination with benzodiazepines. These records also reveal that many of these patients exhibited addiction and/or drug seeking behavior (i.e., Dr. Jarrott’s notations in the charts regarding patients’ over-indulgence of medication, requiring drug detoxification, obtaining drugs from other physicians, etc.). During the year 1995, the investigator conducted a telephone survey of drug stores in Dr. Jarrott’s geographical vicinity. Some pharmacists replied that they no longer see Dr. Jarrott’s prescriptions and some stated that he continued to write for a "lot of opioids”, but the pharmacists surveyed were overly critical of his current prescription practices. The report concluded, "In light of the surgical histories, continuing complaints of pain by the patients and the Board’s re-evaluation of the medical justification for prescribing opioids and ben-zodiazepines for the treatment of chronic, non-malignant pain which has prevailed in the medical literature over the past several years, as well as the aged nature of the information surveyed and reviewed, the [Investigating Officer] and legal counsel request that they be authorized to meet with Dr. Jarrott and advise him of their findings and concerns over his past prescribing practices in disposition of the investigation.”
A supplemental report dated November 21, 1996 notes that in furtherance of the recommendation contained in the initial report, on November 20, 1996, Dr. Bobear, Dr. Cecelia Mouton and legal counsel met with Dr. Jar-rott to discuss the concerns discovered in the investigation. Dr. Jarrott advised that during the time period focused upon in the investigation and until the year 1992, he was associated with a neurosurgeon whose patients were multiple surgical cases with few, if any, options to manage their pain. For these reasons, Dr. Jarrott admitted having been sympathetic to their complaints of pain and in his management thereof with controlled substances. In 1992, Dr. Jarrott retired from his relationship with that neurosurgeon. According to the November 21, 1996 report, Dr. Jarrott expressed an awareness “of and is now more sensitive to his prescribing practices and confirmed to the [Investigating Officer] his intention to continue to be so. He expressed appreciation for Dr. Bobear’s efforts and welcomed his observations and comments. Inasmuch as this matter is reported only for informational purposes, no action by the Board is required.”

. The portion of the Board’s decision concerning Dr. Jarrott’s treatment of R.G. was vacated by the trial court. The Board has not appealed that judgment, and, in its appellate brief, maintains that R.G.'s treatment is not at issue in this appeal.

. Both the Board and Dr. Jarrott produced fact and expert witnesses, and documentary evidence at the Board hearing, and both exercised subpoena power in most, if not all, cases.

. Dr. Jarrott’s pleadings at times seem to seek a stay, and at other times seem to seek injunctive relief.

. Although the Board's ruling made findings of incompetence with respect to Dr. Jarrott’s treatment of two patients, K.S. and T.D., his brief presents argument only as to the findings relating to K.S. We consider Dr. Jarrott's assignments of error relating to the Board's findings concerning T.D. to be abandoned. Rule 2-12.4, Uniform Rules — Courts of Appeal.

. Dr. Jarrott’s brief does not provide argument with respect to this conflict of interest allegation, and it is therefore deemed abandoned. Rule 12-12.4, Uniform Rules — Courts of Appeal.

. The trial court applied that standard of review in its Reasons for Judgment. The trial court found that the Board’s decision was not arbitrary and capricious or unsupported by a preponderance of the evidence, affirming the Board’s decision and the terms of Dr. Jar-rott's probation.

. Dr. Jarrott contends that she did not undergo surgery at that time because her workers’ compensation insurer for the 1993 injury refused to pay for surgery, and K.S. could not afford surgery. However, both Dr. Larry G. Ferachi and Dr. Carlos Pisarello opined that surgery was not indicated in her case.

. Counsel for all parties accepted Dr. Fera-chi as an expert in the field of orthopedic surgery. His medical records concerning K.S. were admitted without objection.

. O/D is used in the charts to indicate "overdose”.

. The Board also found that the drug survey and inventory established that a number of prescriptions written by Dr. Jarrott and filled by K.S. were not entered in her chart.

. The parties accepted Dr. Pisarello as an expert in the field of neurosurgery. Dr. Jarrott objected to his giving opinion testimony concerning pain management. Legal Advisor, Judge Frederick S. Ellis, referred the objection to the weight to be given to Dr. Pisarello’s testimony rather than to its admissibility. Dr. Jarrott has not assigned this ruling as error.

.These guidelines were superseded several months prior to K.S.'s death. Dr. Pisarello's testimony establishes that the guidelines constituted a statement of good medical practice at the relevant times of K.S.'s treatment.

. It should be noted that Dr. Jarrott identified his specialty as neurosurgery, and did not consider himself to be an expert in the held of pain management.

. Dr. Jarrott correctly notes that the malpractice negligence standard is not dispositive of the instant case. However, the investigation and findings of the Medical Review Panel noted hereinabove constitute probative expert evidence relating to the charge of medical incompetence and failure top practice in accordance with accepted local standards.

. Although Dr. Jarrott appears to have abandoned his claim of insufficient evidence with respect to his treatment of T.D., we shall outline some supportive testimony for the benefit of reviewing courts.

. The parties accepted Dr. Thomas as an expert in anesthesiology with a special interest in chronic pain management. Counsel for Dr. Jarrott noted at the administrative hearing that "given his [Dr. Thomas’s] experience with chronic pain management in the absence of a board specialty in that area, [I don't know if] it’s appropriate to qualify him as a chronic pain management specialist, but I'll defer to the Board on that."

. Dr. Correa performed a fusion at C5-C6 and C6-C7, as described earlier in this opinion.

. Specifically, the Act establishes the authority of the D.E.A. to regulate licenses to prescribe and/or dispense controlled substances.